## COMMODORES POINT TERMINAL CO. et al. v. HUDNALL et al.

(District Court, S. D. Florida.    August 9, 1922.)

No. 215.

*(Syllabus by the Court.)*

1. Courts ⬤⟹351½—Motion to dismiss bill denied, unless allegations clearly disclose want of equity.

Under equity rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi), a motion to dismiss the bill of complaint must be denied, unless the motion clearly discloses that on the allegations of the bill which are taken as true it must be dismissed on final hearing for want of equity.

2. Courts ⬤⟹367—State statutes respected and applied in equity, where not conflicting with federal system.

The federal courts have their own independent equity jurisprudence and procedure, yet a state statute, involving a rule of property and not in conflict with the federal system, should be respected and applied in the federal court, particularly in a case removed from a state court.

3. Courts ⬤⟹374—Bill cognizable in state court good in federal court as against motion to dismiss.

A bill in equity to quiet title is permitted by state statute, and upon the removal of the case to the federal court the state statute permitting such bill will be applied.

4. Removal of causes ⬤⟹114—Federal courts will proceed in accordance with procedure below in removed causes.

Under Judicial Code, § 38 (Comp. St. § 1020), federal courts will proceed. in a suit removed there, as if it had been commenced in such court, and the same proceedings taken as had been taken in the state court prior to its removal.

5. Quieting title ⬤⟹11—Bill may be brought without prior adjudication of title in law under Florida statutes.

Under Florida statutes, a bill in equity may be brought to remove clouds on a title without prior adjudication at law.

6. Ejectment ⬤⟹26(1), 116—Only negative equitable defenses without affirmative relief may be made at law in Florida.

Equitable defenses may be interposed in actions in ejectment in Florida, but only negative defenses may be made on the law side, and no affirmative relief can be obtained.

7. Removal of causes ⬤⟹116—Federal court has general jurisdiction to quiet title in removed cause without prior adjudication at law.

However, in a case properly removed from a state court, the federal court independent of state statute has jurisdiction to quiet the title to lands without prior adjudication of the title at law.

8. Injunction ⬤⟹37—Equity interferes for those in possession, where numerous persons claim title without prior establishment of right at law.

The case of Caro v. Pensacola, etc., 19 Fla. 766, cited and applied in this case, to wit, that, "where there is a peculiar state of property in that it is a large tract of land adjoining a growing city and there are a large number of persons claiming possession and title from the same source, as against one or more persons claiming title from the same source, equity will interfere in behalf of those in possession to declare the right, and will enforce it by a perpetual injunction; this without the prior establishment of the right at law, and without proof of threatened irreparable injury."

9. Quieting title ⬤⟹1—Title to land thing in issue, and equity will grant complete and adequate relief.

In a suit to quiet title to land, the title to the land is the thing in issue, and in such a suit, brought by parties in possession against numer-

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ous defendants, each claiming an undivided interest in the land and all basing their claims on the same right, a court of equity will exercise jurisdiction to determine the title, adjudicate the rights of the parties, and grant complete and adequate relief, and to that end will enjoin the prosecution of pending actions in ejectment, commenced separately by two of the defendants for the recovery of the interest claimed by them respectively.

10. **Courts** ⬅343—**One or more members may bring suit in own behalf and for benefit of all members of interested class.**

Where there is a class of persons claiming title separately to parcels of land through a common source, and such class is so numerous as to make it impracticable to bring all members of it before the court, under equity rule 38 (198 Fed. xxix, 115 C. C. A. xxix), one or more members may maintain a bill to quiet title in their own behalf and for the benefit of all other members of the class who may become parties thereto.

11. **Quieting title** ⬅11—**Where complainants possess and assert equitable title, no objection that they have not established title at law.**

It is no objection to a bill to quiet title that complainants have not established their title at law, where equity has jurisdiction of the subject-matter, and where complainants possess and are asserting an equitable title.

12. **Quieting title** ⬅5—**Holders of separate parcels under common source of title may join as complainants against common adversaries to void multiplicity of suits.**

The holders of separate parcels of land under a common source of title may join as complainants in equity against common adversaries to prevent a multiplicity of suits.

13. **Equity** ⬅105—**Separate common claims against same party may be adjudicated in single suit.**

Where a number of persons have separate claims against the same party arising from a common source, involving the same legal rules and similar facts, and the whole matter can be adjudicated in a single suit, all such claimants may unite as complainants against every common adversary, or one may sue in his own behalf and the behalf of the others.

14. **Equity** ⬅39(1)—**Will determine rights inseparable from principal right adjudicated in giving complete relief.**

If, in a bill in equity brought by more than one complainant against more than one defendant, there is one principal right to be established common to all the complainants and adverse to all the defendants, then other rights or causes of action common to less than all the complainants and adverse to less than all the defendants may be averred, as well if such other rights or causes of action are not wholly disconnected from the principal right sought to be established, and a court of equity, in order to give complete and adequate relief, may adjudicate and determine such other rights and causes of action.

15. **Courts** ⬅343—**Equity permits more than one plaintiff to join in single bill, when justified for convenient administration of justice.**

Equity rule 26 (201 Fed. v, 118 C. C. A. v) *held* to permit more than one plaintiff to join in a single bill of complaint, where the causes of action are joint, or where sufficient grounds appear for uniting the causes of action to permit the convenient administration of justice.

16. **Courts** ⬅343—**Equity permits joinder of plaintiffs whose interests are several, where grounds for uniting actions appear.**

Equity rule 26 (201 Fed. v, 118 C. C. A. v) does not prohibit joinder of plaintiffs whose interests are several, where sufficient grounds appear for uniting their causes of action in a single suit.

17. **Courts** ⬅343—**"Joint actions," under equity rules, refers to single question for adjudication common to all complainants.**

Equity rule 26 (201 Fed. v, 118 C. C. A. v), when it speaks of the causes of action being joint, does not mean a technical legal privity, such as a

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

joint contract; but the rule will be satisfied where there is a single question of law and fact common to all the complainants, as where in a suit to quiet title they claim separate parcels of land under a common source of title.

18. **Equity ⟨⟩147—Bill not dismissed for multifariousness, unless interfering with convenient administration of justice.**

Multifariousness of persons and causes of action is largely a matter of convenience. Ordinarily, if there is equity in the bill, a motion to dismiss the entire bill on the ground of multifariousness of persons or causes of action should be denied, unless it appears that the multifariousness will interfere with the convenient administration of justice.

19. **Equity ⟨⟩86—Laches cannot be imputed to one in possession of land under equitable title as against legal title.**

Laches cannot be imputed to one in possession of land under an equitable title.for delay in resorting to a court of equity for protection against the holder of a legal title.

20. **Equity ⟨⟩51(1)—Community of interest sufficiently justifies equity jurisdiction to prevent multiplicity of suits.**

A community of interest in the question of law and fact involved in the controversy, as distinguished from a common right, is sufficient to justify the exercise of equity jurisdiction to prevent a multiplicity of suits.

21. **Equity ⟨⟩39(2)—Quieting title ⟨⟩10(4)—Title by adverse possession may be determined by equity giving adequate relief; title by adverse possession sufficient base for suit to quiet title.**

A claim of title under the statute of limitations, or by adverse possession, may .be considered and determined in a case where a court of equity obtains jurisdiction by reason of the equities stated in the bill, and this in order that complete and adequate relief be given by considering and determining the title so arising under the statute of limitations or by adverse possession. A title under the statute of limitations or by adverse possession may be a sufficient base for a bill in equity to remove or prevent a cloud on such title arising from claims of other persons out of possession.

22. **Quieting title ⟨⟩2—Title to lands held not derived from different sources because differing physically.**

The objection urged by defendants to the bill of complaint in this cause, that it includes lands derived from two distinct sources of title as applied to the uplands and filled-in or made lands adjacent thereto, is not well taken. In this case the ownership of such filled-in lands and proof of title thereto depends upon the title to the uplands. Title to the filled-in lands cannot be proved, without proving the title to the uplands, and vice versa.

23. **Navigable waters ⟨⟩38—Statute retroactively confirmed title to improvements made on riparian lands beyond high-water mark prior to 1921.**

The act of 1921 (chapter 8537, Laws of Florida), among other purposes, was confirmatory in its nature and was made effective as of December 27, 1856, and continuously thenceforward and thereafter, and confirmed to the riparian proprietors and to their grantees and successors in right, according to their several rights, the title, right, and interest given under said act of 1921, which would include the improvements to their said riparian lands beyond high-water mark made prior to 1921.

24. **Equity ⟨⟩363—Motion to dismiss, directed at part of bill, should be specific.**

Where a motion to dismiss a bill of complaint is addressed only to a part of the bill, such part should be set forth in the motion, and be pointed out with such certainty as to give specific information as to what part the defendant would not be required to answer, if the prayer of the motion were granted.

25. Husband and wife ⬤�þ254, 268(1), 273(4)—Marriage ⬤�þ1—Marriage considered partnership under Spanish law; property purchased and debts incurred during marriage common under Spanish law; ganancial property subject to common debts, with remainder to surviving spouse and heirs.

Under the Spanish law in force in the Floridas at the time that those provinces were ceded by Spain to the United States, as such law has been construed by the Supreme Court of Florida, marriage, so far as property was concerned, was to be considered in the light of a contract of partnership, and property purchased or debts incurred during the existence of the marriage relation were deemed to be common, that is to say, were deemed to be the property and debts of the marital partnership, and upon the dissolution of the marriage by death the common property was subject to the common debts, and the surplus or net result remaining after the payment of the common debts was what came into partition between the surviving spouse and the heirs of the dead spouse.

26. Husband and wife ⬤�þ273(9, 10)—Survivor of Spanish-law marriage could sell ganancial lands to pay common debts; deed for ganancial lands to pay common debts deemed by equity to convey entire equitable title; equity will enforce performance by heirs of spouse deeding ganancial lands to pay common debts and enjoin their ejectment suits.

The survivor of a marital partnership, as it continued to exist in Florida after its cession by Spain, like the surviving partner of a conventional partnership, possessed the equitable right to sell the common or partnership (usually called ganancial) real estate for the purpose of paying the common or partnership debts, and in equity the deed of the surviving spouse evidencing such sale will be deemed to have conveyed the entire equitable title to such real estate, and a court of equity in appropriate proceedings will require the heirs of the predeceased spouse to convey the legal title held by them to the purchaser or those holding under him, and will enjoin such heirs from the prosecution of ejectment suits, pending and threatened.

27. Estoppel ⬤�þ70(1)—Efficacy of widow's deed of ganancial property, unchallenged for 75 years, cannot be repudiated by husband's heirs.

Where a widow, the survivor of a marital partnership under the laws of Florida, purports to convey the fee-simple title to common or ganancial property, and for more than 75 years thereafter the survivor's deed remains unchallenged by the heirs of the husband, such acquiescence by such heirs constitutes a construction favorable to the power of the survivor to sell and convey the entire equitable title, and the heirs of the husband cannot repudiate the efficacy of the survivor's deed.

28. Estoppel ⬤�þ107—Defendants' averment, showing means of knowledge of assertion of an estoppel in bill, tantamount to one of actual knowledge.

Where the bill of complaint in a suit to quiet title to real estate asserts an estoppel against the defendants, an averment showing means of knowledge on the part of the defendants is tantamount to an averment of actual knowledge.

29. Estoppel ⬤�þ70(1)—Claimant to lands, long silent during alienation and improvement, of which he had chargeable knowledge, estopped from asserting title.

Where a claimant of land or an interest therein remains silent for many years, and during such period the property has changed hands many times, has been subdivided, and is made the site of a growing city under claim of title adverse to such claimant, and such claimant has or is chargeable with knowledge thereof, he is estopped to assert his title to the land.

30. Estoppel ⬤�þ98(3)—Claimant to real estate bound by matters estopping ancestor through whom he claims.

A claimant to real estate is bound by any matters that would estop the ancestor under whom he claims.

⬤�þFor other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**31. Estoppel ⚖⇒106—Suits may be maintained on equitable estoppel, equity exercising jurisdiction, if more adequate relief afforded.**

A right founded on equitable estoppel constitutes a title on which a suit at law or in equity may be maintained, and where equity can give more adequate relief the estoppel may be enforced in equity, which in such cases will exercise its ancient jurisdiction over estoppel.

**32. Adverse possession ⚖⇒104—Grant presumed to support long and uninterrupted possession of lands on grounds of public policy.**

It is an ancient and settled doctrine that the presumption of a grant of lands will be adopted because of the infirmity of human nature, the difficulty of preserving muniments of title, and the public policy of supporting long and uninterrupted possession. The presumption is founded upon consideration of such facts that could not have occurred according to the ordinary course of human affairs, unless there was a transmutation of title to, and unless there was an existing adverse title in the party in possession.

**33. Adverse possession ⚖⇒104—Long and uninterrupted possession of land presumes grant extending to all formal requisites of title.**

It is a general rule of American law that long and uninterrupted possession of real property, in the absence of rebutting circumstances, creates a presumption of a grant; and the rule will be applied as a "præsumptio juris et de jure" whenever by possibility a right may be acquired in any manner known to law. This presumption is not limited to only one step in the title, but extends to all formal instruments and records that may be necessary to the repose of the title.

**34. Adverse possession ⚖⇒104—Grant of land legally possible presumed.**

In order to presume a conveyance in support of long-continued possession of and unchallenged dominion over real estate, there need be no evidence that such a conveyance was in fact made, nor is the court compelled to believe that such a conveyance was probably made; for it is sufficient that the execution of such a conveyance was legally possible, and that the presumption of its execution would quiet the title to the real estate beclouded and disturbed by the assertion of an ancient and stale claim.

In Equity. Suit by Charles F. Hudnall and others against the Commodores Point Terminal Company and others, removed from state court. On motions to dissolve injunction and to dismiss bill. Denied.

See, also, 279 Fed. 606.

F. P. Fleming, Cockrell & Cockrell, E. J. L'Engle, J. C. Reynolds, John C. Cooper, and H. P. Adair, all of Jacksonville, Fla., and R. H. Liggett, of Washington, D. C., for complainants.

John W. Dodge and Stockton & Ulmer, all of Jacksonville, Fla., for defendants.

CLAYTON, District Judge. The bill was brought for the minor purpose of enjoining actions of ejectment pending in the circuit court of Duval county, Fla., by Charles F. and Mary E. Hudnall, two of the defendants, against five of the complainants, and for the major purpose of clearing complainants' titles to the lands described in the bill. The suit was originally instituted on the chancery side of the circuit court of Duval county, and was removed to this court.

In June, 1921, two of the defendants, Charles F. and Mary E. Hudnall, brought a separate action of ejectment against the Commodores Point Terminal Company, claiming an interest in the lands involved therein and as heirs of Ezekiel Hudnall. Simultaneously they each in-

⚖⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

stituted a separate ejectment against the city of Jacksonville—the lands involved in both these suits being different from the lands involved in the two against the Commodores Point Terminal Company. Each of the same two defendants also began separate actions against the Jacksonville Deep Water Terminals, involving lands other than those in the two actions against the Commodores Point Terminal Company and the two against the city of Jacksonville. Separate actions by each of the same two defendants were afterwards brought against the Seaboard Air Line Railway Company for still other lands than those in the actions hereinbefore specified. Each piece of land sued for is part of the Hudnall grant hereinafter mentioned.

None of the defendants to this bill, except the two above named, has ever begun any action for the lands described in the bill; and no ejectment has been instituted in the state court by the defendants against any of the complainants except the five above mentioned. With the ten suits mentioned pending against the five complainants, covering five separate pieces of property, the complainants filed this bill in the state court, asking that defendants, Charles F. and Mary E. Hudnall, be enjoined from prosecuting the actions; that all the defendants herein be enjoined from instituting any suits against complainants for these lands in their possession and ownership; that the defendants be decreed to have no interest in such lands described in the bill; and for general relief.

Besides the five complainants herein, against whom ejectment suits were pending, the other three complainants, the Southeastern Investment Company, A. G. Cummer, and W. E. Cummer, joined in the bill. Further, the bill also is for the benefit of all others in like situation. In addition to the two defendants, Charles F. and Mary E. Hudnall, who had brought the ejectments, the other seven defendants are joined in this case, and as standing in the same situation with respect to the lands as that of their codefendants, Charles F. and Mary E. Hudnall.

The bill is long, covering more than 245 ordinary typed pages, and alleges may historical as well as existing facts which are essential to a correct understanding of the various aspects of the controversy. The suit, as indicated, is to establish the title of the complainants to lands of which they are in possession, and, incidentally to restrain the prosecution of ten ejectment suits brought by two of the defendants against five of the complainants to recover a two-fifths undivided interest in each of five different parcels of land in the possession of the said five complainants, respectively, all of which are alleged to be held by these five complainants under a common source of title.

As briefly as possible, the allegations of fact, which for present hearing must be taken as true, and are now stated, are disclosed by the bill and the American State Papers, of which the court took judicial notice at defendants' request:

In March, 1817, the Spanish Governor of East Florida duly made to Daniel Hogans a concession of 255 acres of land in East Florida, and situated on the St. Johns river and east of Hogans creek. An official survey of this land was duly made and filed on May 19, 1817, according to Spanish law. Prior to and on November 11, 1818, Ezekiel and Eliza-

beth Hudnall were lawfully husband and wife, and continued so until the death of Ezekiel. On the said November 11, 1818, they were residents of the Spanish province of East Florida, and continued so to be until the death of each. On the said November 11, 1818, the said Daniel Hogans, in consideration of $330 (then paid to him), executed a good and sufficient deed to Ezekiel Hudnall, which conveyed to Hudnall all the interest of Daniel Hogans in said land, and Ezekiel Hudnall and Elizabeth Hudnall thereupon took possession of said land, and that the same became the common ganancial property of Ezekiel and Elizabeth Hudnall, and continued so to be until disposed of by Elizabeth Hudnall as hereinafter detailed, and said tract thereafter became known as the Hudnall grant, by which term it will hereafter be described. Ezekiel Hudnall died prior to 1825.

Afterwards, and prior to May 30, 1825, the heirs of Ezekiel Hudnall filed a petition with the Board of United States Commissioners for East Florida, accompanied by a copy of the concession of this tract of land from the Spanish Governor to Daniel Hogans, dated March 18, 1817, by a copy of the survey thereof dated May 19, 1817, and by a copy of the deed from Daniel Hogans to Ezekiel Hudnall, dated November 11, 1818, wherein they prayed for a confirmation of this title. In these proceedings Daniel Hogans was described as the original claimant, and the heirs of Ezekiel Hudnall as the present claimants of these lands. No mention was made in such proceedings of any conditions being attached to the concession of these lands, and no mention of any conditions is made in the concession itself. On May 30, 1818, the Board of United States Commissioners made the following order on these petitions:

"The board having ascertained the above to be a valid Spanish concession, and the deraignment being regular to Ezekiel Hudnall, the same is confirmed to his heirs."

On March 12, 1834, Elizabeth Hudnall, widow of Ezekiel Hudnall, in contemplation of marriage with Isaac Hendricks, entered into a contract with said Hendricks whereby it was agreed between them that, inasmuch as said Elizabeth had an interest in the undivided estate of her late husband, Ezekiel Hudnall, the said Hendricks released said interest to Elizabeth, to have and to hold and dispose of forever. This marriage was solemnized, and afterwards Isaac Hendricks died, and prior to May 10, 1838. On May 10, 1838, Elizabeth Hendricks, surviving widow of Ezekiel Hudnall, in consideration of $700, then paid to her by David Brown, executed to Brown a deed of general warranty, conveying to Brown and his heirs the fee-simple title to the whole of said Hudnall grant. It is alleged that at the time of this conveyance said Hudnall grant was community property of the connubial society previously existing between Ezekiel and Elizabeth Hudnall under Spanish law; further, that on May 10, 1838, there remained in force and effect common debts of said Ezekiel and Elizabeth Hudnall incurred during the existence of their marital relation, and that said Elizabeth had the power to make sale and conveyance of said Hudnall grant to David Brown for the purpose of paying said common debts. It is averred that the deed to Brown vested in him and his heirs the complete benefi-

cial and equitable title to said Hudnall grant, discharged from any claim, equity, interest, or title of any heir of Ezekiel Hudnall. On October 18, 1849, David Brown and wife conveyed the Hudnall grant to Brantley and Bryant by warranty deed.

Ezekiel Hudnall left five heirs at law, children of himself and his wife, Elizabeth, namely, Henry Hudnall, Eliza Hudnall, afterwards Eliza Bagley, Francis and George Hudnall, and Emily Hudnall, afterwards Emily Donaldson. In May, 1851, three of these heirs, Francis and George Hudnall and Emily Donaldson (née Hudnall), by deeds of quitclaim released any interest which they had in the Hudnall grant to Brantley, one of the grantees of David Brown, and said quitclaims inured to the equal advantage of Brantley and his cotenant, Bryant. In 1850 Brantley and Bryant partitioned the Hudnall grant by oral agreement; Brantley taking the west side, and Mrs. Bryant (then Mrs. Houston) taking the east side. After having conveyed several smaller tracts, Brantley and Houston in 1852 conveyed the west side to Timanus, who in that year moved on the property with his slaves, took up his residence in a house built thereon by Brantley, and began the cultivation of the soil. In 1855 Timanus sold a part of his river front to Blackwood and Taylor, who in that year built a sawmill thereon, which was operated by such persons and their assigns until it was burned during the war between the states. This mill was known as the Mecklenberg Mill, and it was afterwards made the site of a larger mill hereinafter described. In 1857 Timanus sold the west side of the grant to Johnson, who immediately entered into the occupation thereof.

In 1866 Johnson sold the greater part of his river front to Moody, and in that year Moody and his assigns erected a large sawmill thereon, which was operated until 1872, when it was burned. Prior to 1869 Johnson laid off the remainder of the tract into a town site, and recorded a plat thereof, with division into streets, lots and blocks. Prior to 1881 all these lots had been sold off to different persons. In 1861 Mrs. Houston (Bryant) sold and conveyed the east end of the Hudnall grant to Hearn, and in 1867 Hearn sold a large part of this tract to Wilson, from whose estate the tract was acquired in 1869 by Parker, who in the same year laid it off into streets, lots, and blocks, and in 1870 recorded the plat thereof.

Beginning with 1851, parties claiming title to the Hudnall grant conveyed different parcels of it from time to time, which conveyances increased in number from year to year, and in 1921, at the filing of this bill, said tract was divided in hundreds of different tracts, claimed and possessed by as many different individuals and corporations, each claiming title under a chain of title based on the deed from David Brown, and each deed was duly recorded. David Brown and his said successors in title have been in the open, exclusive, and adverse possession of the Hudnall grant from May 10, 1838, to the time of the bringing of this suit; and said possession, dominion, and control has been exclusive of every claim and right of Henry Hudnall and Eliza Bagley (née Hudnall) and their heirs, and all persons claiming under them. Neither Henry Hudnall, nor Eliza Bagley, nor their heirs, has or ever have been in possession of the whole or any part of said lands, and the grant

has never been assessed, in whole or in part, to any heir or descendant of any heir of Ezekiel Hudnall, and they have never paid taxes on said lands or any part thereof.

David Brown and his successors in title have paid all taxes on said land from 1838 to the present day, and have made all the improvements on said land that have been made. This property, which in 1840 was assessed as third-class farm lands, and against which a tax of 95½ cents was assessed, is to-day the site of a city of 8,000 or 9,000 people, has paved streets, an electric railway, and all the conveniences of a modern urban community, and the persons now in possession of the tract as subdivided claiming under David Brown pay annual taxes on such property to an amount exceeding $150,000.

In the summer of 1921 the defendants, Charles F. and Mary E. Hudnall, separately sued each of the complainants, Commodores Point Terminal Company, the city of Jacksonville, Jacksonville Deep Water Terminals, Seaboard Air Line Railway, and A. W. Cockrell, Jr., in ejectment, in each of which actions the said plaintiff seeks to recover from said complainants, respectively, the tracts of land of which each is alleged to be the owner, as set forth in paragraphs 1, 2, 4, 5, 6, and 7 of the bill, except that the Seaboard Air Line Railway is in the possession of the lands described in paragraph No. 7 as the lessee of the complainant, the Southeastern Investment Company, as alleged in paragraph No. 7.

The defendants Charles F. and Mary E. Hudnall claim title to an interest in said lands as heirs at law of Ezekiel Hudnall, and trace their descent through said Henry Hudnall, son of Ezekiel Hudnall, deceased, and Milo F. Hudnall, deceased, son of Henry Hudnall, and father of the plaintiffs Charles F. and Mary E. Hudnall, and said defendants claim an interest in the entire Hudnall grant, and especially in the lands described in paragraphs 1 to 7, inclusive, of this bill, in right of said Henry Hudnall, deceased, and through said Milo F. Hudnall, their deceased father.

The defendants William D. McNamar, Ezilla Sparkman, George B. Prevatt, and Dorothy Prevatt Harris claim an interest in the entire Hudnall grant, and particularly the lands described in paragraphs 1 to 7, inclusive, as heirs at law of Ezekiel Hudnall, deceased, in right of his daughter Eliza Bagley, and also trace their right by way of devise through Elizabeth Ann Henderson, another daughter of Eliza Bagley; and it is alleged that said defendants William D. McNamar, Ezilla Sparkman, George B. Prevatt, and Dorothy Prevatt Harris are assisting said Charles F. and Mary E. Hudnall in the prosecution of their suits, and openly claim that they will take advantage of any judgment entered therein, and will, if necessary, institute actions in their own behalf.

It is claimed by complainants that, since the heirs of Ezekiel Hudnall in 1823 filed a petition for the confirmation of the title to these lands before the board of commissioners, said heirs, including Henry Hudnall and Eliza Bagley (née Hudnall), at that time obtained knowledge of their interest in the Hudnall grant, as heirs of Ezekiel Hudnall, and that the defendants are chargeable with the effects of this knowledge thus shown to have been possessed by their ancestors. It is al-

leged that Henry Hudnall and Eliza Bagley had knowledge, actual or constructive, of the conveyance from Elizabeth Hendricks to David Brown in 1838.

Milo F. Hudnall, father of the defendants Charles F. and Mary E. Hudnall, was born in 1832 and died in 1904. As a boy he lived with his uncle in plain sight of the Hudnall grant, and about 1854 he was engaged in business in Jacksonville, Fla., in the environment of the grant, and had business dealings with the people then living thereon, and engaged in operating sawmills thereon. Milo visited Jacksonville on several occasions between 1870 and 1890, and carried on a correspondence with relatives living in Jacksonville up to the time of his death and frequently saw them; and the defendant Mary E. Hudnall over 30 years ago paid a visit of several weeks duration to relatives living in Jacksonville.

Elizabeth Hendricks lived in Jacksonville until her death, which occurred after 1865. Her daughter, Eliza Bagley, lived in Duval county, Fla., during her lifetime, and her daughters, Mary Prevatt and Elizabeth Ann Henderson, under whom defendants claim, resided in Duval county and Jacksonville during their lives, and it is alleged that all of these persons had frequent communication with said Elizabeth Hendricks. The defendants Ezilla Sparkman, George B. Prevatt, and Dorothy Prevatt Harris, all lived in Duval county, Fla., until recently. It is charged that all of the defendants and the successive generations of their ancestors had ample opportunity to learn all the facts connected with their interest in the Hudnall grant, if they had any.

In 1857, Milo F. Hudnall, Mary Prevatt, and Mary Ann Henderson, under whom defendants claim, joined with the other heirs of Ezekiel Hudnall and his widow, Elizabeth, in the sale and conveyance of 900 acres of land situated in Putnam county, Florida, which belonged to Ezekiel Hudnall's estate, and received the purchase price of $625 therefor. The complainants claim that, having knowledge that this tract of 900 acres belonged to Ezekiel's estate, the defendants' ancestors were under an obligation to inquire whether there was any other property in which they had an interest as heirs of Ezekiel, and that they are chargeable with notice of all the information they could have obtained by diligent inquiry.

Complainants also assert that, as the E. Hudnall grant was sold to pay the debts of Ezekiel Hudnall, the defendants' ancestors personally derived an advantage therefrom, since such sale relieved the Putnam county lands from the burden of those debts, and enabled those ancestors to personally enjoy the benefit of the proceeds of the sale of the Putnam county lands. Complainants insist that defendants are consequently estopped to deny the validity of the deed from Elizabeth Hendricks to David Brown.

Having special reference to the particular lands which complainants claim to own: The tract owned by the Seaboard Air Line Railway and Southeastern Investment Company was purchased from Brantley and Bryant in 1851; a sawmill was erected on that land in that year, and operated continuously until 1907, having meanwhile passed through various hands by means of deeds of conveyance from

parties claiming under David Brown; in 1907 a contract of lease and purchase for said tract was obtained by the Seaboard Air Line Railway, which in that year constructed docks on said property at a cost of $135,000, and in 1917 the said railway exercised its right to purchase said property for the sum of $300,000, then paid by them; and it is especially alleged that this property has been in the actual possession of the complainants, the Southeastern Investment Company and Seaboard Air Line Railway, and their predecessors in title, since May 10, 1838, to the present time.

As to the tract of land claimed to be owned by the complainant the Jacksonville Deep Water Terminals, this property was purchased in 1852 from Brantley and Bryant by Capron A. Kelly, who in that year built a sawmill thereon, and a sawmill was operated on said property for a period of sixty years thereafter, the property having in the meanwhile passed through different hands by virtue of various deeds of conveyance executed by parties claiming under David Brown, in 1907 the property was sold and conveyed for the price of $150,000, and in 1910 said property was purchased by the complainant Jacksonville Deep Water Terminals, for $300,000.

On April 5, 1880, L. W. Spratt, by a special master's deed, executed pursuant to a final decree of foreclosure of a mortgage thereon against said Louisa R. Johnson, and duly confirmed, acquired the lands described in paragraph 5 of the bill. Said L. W. Spratt died on October 4, 1903, testate, and in and by his last will, duly admitted to probate, devised said lands to the complainant A. W. Cockrell, Jr., who is the owner thereof. During the years 1907 to 1917, the complainants, A. G. Cummer and W. E. Cummer, by mesne conveyances from Jacob S. Parker, acquired the lands to the north and east of the lands conveyed by Michael Hearn to W. J. Hardy as hereinafter described, including the lands conveyed by said A. G. and W. E. Cummer by their warranty deeds to the Commodores Point Terminal Company and the city of Jacksonville, as hereinafter described, and the lands described in paragraph 3 of the bill of complaint, of which the said A. G. and W. E. Cummer were at the time this suit was filed, and still are the owners.

As to the property of the complainant Commodores Point Terminal Company described in paragraph No. 1, and for which they are sued —in 1866 William J. Hardy acquired the site of the Mecklenberg sawmill, which was erected in 1855 and burnt during the Civil War, and Hardy in the same year acquired a larger tract immediately to the east thereof and bounded on the St. Johns river by conveyances from Hearn, the grantee of Houston as hereinbefore described; Hardy in that year erected a larger sawmill on the site of the Mecklenberg mill and extended a log boom along the entire water front of the property purchased from Hearn and erected a wharf in front of his mill. He erected a number of buildings on the Hearn tract for the use of his employees, and at once began the manufacture of lumber, which was continued until 1870 when the mill was burned.

Referring to the various sawmills hereinbefore described, including Bellechasse & Finnegan's mill erected in 1851, Capron & Kelly's mill erected in 1852, Blackwood & Taylor's mill erected in 1855, and known

as the Mecklenberg mill, Hardy's mill erected on the site of the Mecklenberg mill in 1866, and Moody's mill erected in 1866, the respective owners thereof filled in parts of their water front, built booms for the accommodation of their logs, erected wharves from which vessels took on lumber to be transported to distant ports; and the manufacture of lumber was carried on at these respective mills from the time of their erection until the mills were destroyed or the property converted to another use as hereinbefore described. The manufacture of lumber at these mills was the chief industry of Jacksonville, and was one of the most conspicuous features of that city in that day.

After the Hardy mill was burned in 1870, and prior to 1914, the title to the Hardy tract, with its extended frontage on the St. Johns river, became vested in Coachman and Taliaferro by certain mesne conveyances, excepting the west 300 feet thereof; and prior to 1914 the title to the adjoining tract lying to the east of the Hardy tract, and also bounding on the river St. Johns, had become vested in the Cummers, complainants hereto. Further, in the early part of 1914 the said Coachman and Taliaferro and the Cummers entered upon the said Hardy lands and a part of the Cummer lands adjoining the Hardy tract, and erected temporary quarters thereon for the use of laborers and employees, surveyed the lands, and made extensive soundings of the river bottom in front of said lands. In 1915 said parties incorporated the Commodores Point Terminal Company, to which they conveyed the said lands belonging to Coachman and Taliaferro and the Cummers; said company took immediate possession of said lands and proceeded to bulkhead said lands with a permanent steel and concrete bulkhead, and filled in said lands with rock and soil dredged from the river bed; and upon the land so prepared erected warehouses, storage sheds; oil and other tanks, built extensive railroad tracks connecting with spur tracks of trunk line, which had been built into said property at complainants' request; laid out and constructed hard-surfaced roads, installed warehouse and storage facilities for oils, cotton, coal and all kinds of merchandise, established the largest naval stores yard in the world, and, in making said improvements said Commodores Point Terminal Company expended more than $680,000, exclusive of the purchase price of the land. The Seaboard Air Line Railway, prior to 1908, acquired the west 300 feet of the said Hardy tract, and the property conveyed to Moody by Johnson on which a sawmill once stood, and prior to 1917 said railway had extended its tracks over and across the said lands.

As to the property of the city of Jacksonville described in paragraph No. 2, and for which said city has been sued by defendants Charles F. and Mary E. Hudnall, this property is a part of the property acquired by A. G. and W. E. Cummer by mesne conveyances from Parker, as previously set forth; in June, 1918, said Cummers executed to the United States Shipping Board Emergency Fleet Corporation a lease of said part with an option of purchase, and said corporation thereupon spent hundreds of thousands of dollars in bulkheading and filling in the river front of said lands and in the construction of other expensive improvements thereon. On July 19, 1920, said corporation

assigned its said contract of lease and option of purchase to the city of Jacksonville, and said city thereupon purchased said tract of land from A. G. and W. E. Cummer for $315,000, and the city is now the owner thereof.

In regard to each of the properties of the respective complainants, each of the complainants and their predecessors in title have title thereto by virtue of mesne conveyances, commencing with David Brown, grantee of Elizabeth Hendricks, and they and their predecessors in title have been in the open, exclusive, and adverse possession of these lands since May 10, 1838. They and their predecessors in title severally purchased these properties for value, and improved the properties without notice of the claims of the defendants and in reliance upon the title of David Brown. The defendants allowed their claim to lie dormant and concealed from 1838 until 1916. A suit commenced by defendants Charles F. and Mary E. Hudnall in 1916 against the Seaboard Air Line Railway and Jacksonville Deep Water Terminals for a recovery of a part of these lands was dismissed on the merits in 1918, and said defendants took no further steps to enforce said claim till June, 1921, causing complainants to believe that said claim had been abandoned.

The complainants, and those under whom they claim, have been in the actual, open, continuous, and adverse possession of the lands claimed by them, respectively, since May 10, 1838, to the time of bringing this suit, and during all the while have paid the taxes on the lands and protected and improved them. During the same period the defendants and their ancestors have never been in the possession of the whole or any part of the Hudnall grant, have never paid taxes thereon, and until 1916 none of the defendants nor their ancestors ever made any claim to this property. These properties, either in whole or in part, were for many years used for sawmill purposes. During the last 15 years the value of these lands, now city lots, has greatly increased, and every lot has several times changed hands during that period at much enhanced prices. In 1912 improvements to the extent of $135,-000 were placed on the property of the complainant, the Southeastern Investment Company. Between 1914 and 1918 the Commodores Point Terminal Company improved its property to the amount of $680,000.

It was not until after the complainants, Commodores Point Terminal Company, Jacksonville Deep Water Terminals, the Southeastern Investment Company, the Seaboard Air Line Railway, and W. E. and A. G. Cummer, had invested large sums of money in the purchase of these properties that the defendants made known their claim to the Hudnall grant, and it was not until Commodores Point Terminal Company and Seaboard Air Line Railway had expended the large sums of money in the improvement of their properties that the actions of eject-ment were instituted.

In its larger aspects, this suit presents the claim that David Brown and his successors have for over 80 years occupied, cared for, and improved a tract of 255 acres, and in that time have changed it from farm lands into a city of over 8,000 people. In 1840 the population of Jacksonville was only 350 people. The Hudnall grant was then farm land

lying outside the city limits. In 1890, 2,575 people were living on the grant; in 1900, 4,645 people; in 1910, 6,803 people; and in 1920, 8,918 were living thereon.

While a city was being built on this land, these defendants allowed their claims to lie dormant and concealed, and they have wholly failed to perform any of the duties in respect to this land which their alleged ownership, if genuine, imposed on them.

The case now comes on for hearing, upon the separate motion of Charles F. and Mary E. Hudnall to dismiss those parts of the bill seeking to enjoin the pending actions of ejectment, on the ground that no sufficient facts are alleged for enjoining the actions at law pending in the state court when this bill was brought, and also upon the other motions to dismiss—these latter motions are joined in by all the defendants. All of the motions are predicated upon the grounds that the bill is without equity, that it is multifarious, and that there is a misjoinder of complainants and defendants.

[1] The motion to dismiss is to be treated as a general demurrer, which admits as true the facts alleged in the bill. Under equity rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi) a motion to dismiss the bill of complaint must be denied, unless the motion clearly discloses that on the allegations of the bill, which are taken as true, it must be dismissed on final hearing for want of equity. See footnotes to rule 29 in Hopkins' New Eq. Rules (3d Ed.); O'Keefe v. New Orleans (D. C.) 273 Fed. 560, and (C. C. A.) 280 Fed. 92.

[2] Of course, the federal courts have their own independent equity jurisprudence and procedure; but it must be said that generally provisions of the state statute involving a rule of property are not in conflict with the federal system, and should be respected and applied in the federal court, particularly in this case removed from the state court.

[3] This bill was properly cognizable in the state court of equity, where it was brought, and it is good here, as against the motion to dismiss. Sections 3212 and 3213, Rev. Gen. Stats. of Florida. Courts of chancery have jurisdiction to determine a title of one or more persons claiming to own a parcel of land or portions thereof under a common title, as against defendants who claim adversely, whether under common title or not, and to quiet the title, awarding injunctions, etc. These statutes declare that it shall not be a bar to relief that the title has not been litigated at law, and that the adverse claim is void on its face, etc., and they are applicable to the instant case.

[4] Section 38 of the Judicial Code (Comp. St. § 1020) provides that the District Court shall, in suits removed there, proceed as if it had been commenced in such court, and further:

"The same proceedings had been taken in such suit in said District Court as shall have been therein in said state court prior to its removal."

[5] It is plain that under the Florida statutes the party in possession of land is authorized to bring his bill to remove clouds on his title, without a prior adjudication at law. These cases are supporting authority: Hatcher v. Hendrie, etc., Co., 133 Fed. 267, 68 C. C. A. 19;

Guernsey v. Cross (C. C.) 153 Fed. 827; and Blumberg v. Shaw Co. (C. C.) 131 Fed. 608.

[6] It is true that equitable defenses may be interposed in actions of ejectment in Florida, but the adjudged cases hold that only negative defense can be made on the law side, and that no affirmative relief can be obtained. Capital City Bank v. Hilson, 64 Fla. 206, 60 South. 189, Ann. Cas. 1914B, 1211; Smith v. Love, 49 Fla. 230, 38 South. 376; Norman v. Beekman, 58 Fla. 325, 50 South. 876.

It was held in Hobbs v. Chamberlain, 55 Fla. 661, 45 South. 988, that it was proper for a defendant in ejectment to resort to a bill in chancery to enjoin the prosecution of the ejectment, and thereby bring the entire subject-matter of the action into chancery, when the defendant in ejectment desired affirmative relief, such as to more effectually clear his title. It is to be noted in that case it was asserted that the business of the defendant in ejectment, complainant in equity, would be irreparably damaged, and that was the sole ground for chancery intervention.

In Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712, 35 L. Ed. 358, the Supreme Court of the United States, it is true, held that the Mississippi statutes authorizing an equity court to try an action on open account would not be enforced in a federal court, because it deprived the parties of their constitutional right of trial by jury; but in that case, Clark v. Smith, 13 Pet. 195, 10 L. Ed. 123, and Holland v. Challen, 110 U. S. 15, 3 Sup. Ct. 495, 28 L. Ed. 52, were upheld. In the first of these, the act of Kentucky of 1796 (Laws 1799, c. 98) was very like the Florida law now relied upon here by the plaintiffs. In the other of these cases, the Nebraska act was also similar to the Florida statute. In both cases the Supreme Court of the United States sustained the jurisdiction of the federal equity court and enforced the state statutes.

[7] However, without such statute the general federal equity rules are controlling, for the federal equity courts, independent of state statute, have jurisdiction to quiet title to real estate without prior adjudication of the title at law. I call attention to the language of the opinion by Justice Field, sitting in Circuit Court, in Central Pacific R. Co. v. Dyer, 1 Sawyer, 641, Fed. Cas. No. 2,552. It is hardly necessary for this language to be quoted here. And then the same may be said of the case of Stark v. Starr, 6 Wall. 402, 18 L. Ed. 925, where the same justice, delivering the opinion, said that:

"This is a suit in equity to quiet the title of the plaintiff to certain parcels of land situated in the city of Portland, in the state of Oregon. It is founded upon a statute of that state which provides that 'any person in possession of real property may maintain a suit in equity against another who claims an estate or interest therein adverse to him, for the purpose of determining such claim, estate, or interest.' This statute confers a jurisdiction beyond that ordinarily exercised by courts of equity, to afford relief in the quieting of title and possession of real property. By the ordinary jurisdiction of those courts a suit would not lie for that purpose, unless the possession of the plaintiff had been previously disturbed by legal proceedings on the part of the defendant, and the right of the plaintiff had been sustained by successive judgments in his favor. Shepley v. Rangely, Davies, 242; Devonsher v. Newinhan, 2 Schoals & Lefroy, 208; Curtis v. Sutter, 15 California, 257. * * * By the statute in question it is unnecessary, in order to obtain this interposition of equity, for the party in possession to delay his suit until his

possession has been disturbed by legal proceedings, and judgment in those proceedings has passed in his favor. It is sufficient that a party out of possession claims an estate or interest in the property adverse to him. He can then at once commence his suit, and require the nature and character of such adverse estate or interest to be set forth and subjected to judicial investigation and determination, and that the right of possession as between him and the claimant shall be forever quieted."

To the like effect are Holland v. Challen, 110 U. S. 15, 3 Sup. Ct. 495, 28 L. Ed. 52; Mayor of York v. Pilkington, 1 Atk. 281, 282.

[6] It may be added that we need not, in passing upon this question relating to real estate in Florida, go farther in search of authority than Caro v. Pensacola, etc., Co., 19 Fla. 766, for there the court said that:

"Where there is a peculiar state of property, in that it is a large tract of land adjoining a growing city, and there are a large number of persons claiming possession and title from the same source as against one or more persons claiming title from the same source, equity will interfere in behalf of those in possession to declare the right, and will enforce it by a perpetual injunction; this without the prior establishment of the right at law, and without proof of threatened irreparable injury."

In Hughes v. Hannah, 39 Fla. 366, 378, 22 South. 613, the court referred with approval to the Caro Case, and the principle is sustained in Alexander v. Pendleton, 8 Cranch, 462, 468, 3 L. Ed. 624, and numerous other decisions by the federal courts, District, Circuit, and Supreme. Among them is Osborne v. Railroad Co. (C. C.) 43 Fed. 824, the opinion in which is a good specimen of judicial reasoning and of faultless diction.

The defendants have not moved directly to vacate or dissolve the injunction issued out of the state court. The injunction was against the ejectment suits, wherein two of the defendants here were plaintiffs there. That action was an adjudication, for the purpose of ordering this injunction, the court there having taken jurisdiction of the subject-matter of the controversy and the parties, and that was at least an ascertainment of apparent equity in the bill.

Doubtless the proper practice on removal of any ordinary case from the state court to the federal court is that the cause shall proceed in the latter exactly as it would have proceeded in the former, if there had been no removal. The federal courts—subject to exceptions which need not be stated—will, as a general proposition, respect orders previously made in the state court in the case before the transfer; for instance, where there is no direct motion to dissolve the injunction, and especially so when from the substance of the bill it cannot be said that this injunction was improvidently issued. The defendants might have moved directly to vacate or dissolve the injunction on the ground that the bill is without equity, or predicated such motion on some proceeding setting up entirely new matters aliunde; but this court will not, on the motion now presented, reverse the order made by the state court in the case prior to its removal.

I think that section 29 of the Judicial Code (Comp. St. § 1011) cannot help the defendants. It requires that, when a case is removed to the District Court, such court "shall then proceed in the same manner as if it had been originally commenced in the said District Court." The

record shows that a motion was made by the defendants Charles F. and Mary E. Hudnall to vacate the order of injunction made by the judge of the state court upon the ground that the order was entered after the filing of the first petition and bond for removal. The record further shows that in the proceeding in this cause before Judge Call, as judge of this court, the question of the removability of the case, the bill praying for an injunction to enjoin suits at law, and also the question of separable controversy, were raised, and that he entered his order denying the motion to vacate the injunction of the state court, where it was granted after the first petition for removal had been filed. In his opinion, on such motion of Charles F. and Mary E. Hudnall, Judge Call stated in his findings that the parties complainant and defendant deraigned under a common source of title. This question was directly connected with the determination of the motion to vacate the injunction.

Two of the defendants have brought ejectment suits, each claiming a one-eighth undivided interest. The remaining defendants, also claiming undivided interests, have not sued. If no action at law had been brought, complainants in possession would undoubtedly have the right to file a bill to quiet title under the Florida statutes, and also under general equity practice, as illustrated by the case of Sharon v. Tucker, 144 U. S. 533, 12 Sup. Ct. 720, 36 L. Ed. 532. The right of complainants in possession to file this bill against defendants who have not sued in ejectment is not affected by the pending ejectment suits, the subject-matter of which is merely the fractional interests of two of the heirs. The ejectment suits cannot determine any rights between the complainants and the heirs who have never sued. Hence this court for that reason and others herein adverted to, can entertain jurisdiction of this bill as to all the defendants other than Charles F. and Mary E. Hudnall, regardless of the ejectment suits.

It is argued that, as to Charles F. and Mary E. Hudnall, the ejectment plaintiffs, the court of law affords a remedy which excludes the jurisdiction of equity. This argument is unsound, because the court of equity, under the facts here, alone possesses the power to determine the title to the property involved. The insistence is based perhaps principally upon Byrne v. Brown, 40 Fla. 109, 23 South. 877. There it was a bill in equity to enjoin a single ejectment suit brought by three heirs asserting title against a party in possession claiming an adverse title. The suit was to have complainants' title adjudicated and held valid, and the action of ejectment enjoined. An examination of the court's opinion discloses that the conclusion there reached was upon the ground that the courts of law and equity had concurrent jurisdiction, and that the refusal to entertain the bill, which went off on demurrer, was bottomed on some notion akin to comity. So it seems to me that such case has no bearing upon the instant one. The differentiation need not be pursued. Moreover, it is hardly necessary to say that, besides consideration of convenience and economy, there are special and supervening equities which take this case out of the rule illustrated in Byrne v. Brown. The pendency of the ejectment suits by two of the defendants cannot operate to defeat the jurisdiction of this court.

[9] The chief object of this suit is to quiet the title to 255 acres

of land in the city of Jacksonville. The title to the land is the thing in issue, and the suit is brought by parties in possession against numerous defendants, each claiming an undivided interest in the land, and all basing their claims on the same right; therefore a court of equity has and will exercise jurisdiction to determine the title and adjudicate the rights of all the parties and grant complete and adequate relief, and to that end will enjoin the prosecution of the ejectments instituted by Charles F. and Mary E. Hudnall, two of the defendants, for recovery of the interest claimed by each, and will at the same time enjoin all threatened actions of ejectment by any and all defendants. This property is held by a great number of persons under title derived from a common source, and the claim of title made by defendants is a cloud upon the title, which all of such persons hold, including the complainants. The complainants claim title under Ezekiel Hudnall and Elizabeth Hudnall, and the defendants rely for their title upon the same common source. More than 1,000 persons, including the complainants, have their titles affected injuriously by the claims of the defendants. The bill also shows among other things that persons who hold title to these lands, which was originally the Hudnall grant, before they can dispose of them or use them in borrowing money, are obliged to obtain conveyances from the defendants.

This does not seem to be a case where it is necessary that the issues be tried in a court of law. Proceedings there would not give complete and adequate relief to the complainants and those in like situation. It is a case for equity cognizance, where the procedure is adaptable and the remedy comprehensive—in short; adequate. The fact that similar claims of title are made by the defendants other than Charles F. Hudnall and Mary E. Hudnall, other than those asserted by those two defendants, renders it necessary that such similar claims of other defendants should be tried in the same litigation in which the claims of Charles F. and Mary E. Hudnall are passed on.

[10] Such other defendants have not as yet brought ejectment, but are making the same kind of claim, and manifest an intention to bring suits, and it follows that their claims constitute the same cloud upon the title of complainants and those in like situation as that created by the claims of Charles F. and Mary E. Hudnall in their actions at law. By decree in this case, the title of each of the complainants and all persons in like circumstance who make themselves party to the suit may be cleared of record of the cloud.

This is a case where the complainants were authorized to bring their suit in equity in their own behalf and for the benefit of all persons in like situation who may become parties thereto, for the question of title is of common interest to many persons constituting a class so numerous as to make it impracticable to bring all before the court. This principle is covered by Equity Rule 38 (198 Fed. xxix, 115 C. C. A. xxix) which is former rule 48 amended. Prentice v. Duluth Storage Co., 58 Fed. 437, 7 C C. A. 293, and cases therein cited. Besides, a similar statute to that of Florida authorizing this character of suit was upheld in the case last mentioned. As to the appropriate and effective character of relief in a cause in equity like the present, one to enjoin an action in

ejectment, Bostwick v. Florida C. & W. R. Co., 61 Fla. 850, 56 South. 290, is apposite and illustrative.

[11] The attack upon the bill on the ground that it does not appear that the title of the complainants has been established at law is met when it is said that equity has jurisdiction of the subject-matter of this bill, notwithstanding there has been no prior adjudication of the title at law, and for the reasons that the complainants possess an equitable title and are asserting it (Shanks v. Klein, 104 U. S. 18, 26 L. Ed. 635, and Crews v. Burcham, 1 Black, 352, 17 L. Ed. 91). And, furthermore, that by the express language of the Florida statute this ancient requirement is abrogated; and this bill is framed under that statute which gives an unconditional right to persons holding title to lands under a common source to file a bill to determine the title; and Rev. Gen. Stats. § 3212, dispenses with previous adjudication. The statute (section 3213) in terms provides that:

"It shall be no bar to the granting of relief to the complainant in such cases that the title has not been litigated at law."

[12] All of the complainants claim an equitable title to their respective parcels of land under the same common source; that is, the deed from Mrs. Hendricks to David Brown. All of the complainants therefore "have one common interest" in an equitable title against each and all of the defendants. It is stated in Story's Equity Pleading, § 533, that:

"The result of the principles to be extracted from the cases on this subject seems to be that where there is a common liability and a common interest— the common liability in the defendants and the common interest in the plaintiffs, different claims to property, at least if the subjects are such as may without inconvenience be joined, may be united in one and the same suit."

That the holders of separate parcels under a common equitable title may join as plaintiffs cannot be doubted, in view of the decisions in the Shanks and Crews Cases, supra, for they are instances where the holders of separate parcels claiming under a common equitable title joined in one bill of complaint against a defendant or defendants who was or were adversely interested. The holders under a common source of title suing in equity to prevent a multiplicity of lawsuits may join as complainants, even though their several causes of action relate to separate parcels of land. Such was the holding of Judge Harlan in Osborne v. Railroad Co., supra. He said that while the plaintiffs had separate and distinct interests, because of their respective claims of ownership in separate parcels of land, they could join in one bill against the railroad company whose claim was good or bad against all the plaintiffs and each of them.

[13] It is well settled that where a number of persons have separate and individual claims and rights of action against the same party, arising from a common cause or governed by the same legal rules and involving similar facts, and the whole matter can be adjudicated in a single suit, all of the parties may unite as co-complainants, or one of them may sue on behalf of the others. 1 Pom. Eq. Juris. § 245 et seq. The Florida Rev. Gen. Stats. §§ 3212, 3213, expressly permit two or more parties owning separate parcels of land to join in a single bill of

complaint, where their titles are derived from or held under a common source. Equity rule 26 (201 Fed. v, 118 C. C. A. v), as we construe it, expressly permits more than one plaintiff to join in a single bill of complaint, if sufficient grounds appear for uniting their causes of action, to promote the convenient administration of justice.

The validity of the widow's deed will settle this case, whether it be sustained on the ground of the surviving partner's right to convey the equitable title, or estoppel against contesting the deed, or presumed conveyance either to Mrs. Hendricks or to David Brown. No practical advantage would be obtained by requiring separate bills of complaint. If filed, they would doubtless be consolidated on application of any party. The practical convenience of the defendants, as well as the complainants, will be promoted by the joinder of the complainants in one bill at the outset. The rule against misjoinder is one merely of convenience, and in this instance the convenience is all on the side of the joinder of complainants.

[14] It was argued that complainants have set up title by adverse possession and that this fact destroys the right of joinder. However, this bill does not rest upon adverse possession solely, but, even if it did, it is brought by more than one complainant against more than one defendant, and there is one principal right to be established; that is, the title to the land in question common to all the complainants and common and adverse to all the defendants. This being so, then other rights or causes of action common to less than all the complainants and common and adverse to all the defendants; nevertheless, such other rights or causes of action may be averred as well, provided such other rights or causes of action are not wholly disconnected from the principal right sought to be established; and consequently a court of equity, when called upon to give complete and adequate relief, may adjudicate and determine such other rights and causes of action as related to and inseparable from the principal right to be adjudicated. If the court were to stop short of this, its decree would be neither complete nor adequate. The general jurisdiction of equity to entertain a suit by many persons against one or more defendants, where there is a general right to be established common to the complainants and adverse to each of the defendants, is an ancient and well-settled doctrine, from which this bill is not a departure. Story's Equity (14th Ed.) §§ 1174, 1175. Here the claim of title under the statute of limitations or by adverse possession may be considered and determined, for this court of equity has obtained jurisdiction by reason of the equities stated in the bill; and this must be so in order that complete and adequate relief be afforded by considering and determining the title that has so arisen. Undoubtedly a title so derived is a' sufficient basis for a bill in equity to remove a cloud on such title arising from the claims of the other persons, the defendants here, out of possession of the land.

It was argued that this bill cannot be maintained unless each complainant should sue separately. Without conceding such test, this case meets the objection. Each complainant can bring a bill to establish title against all adverse claimants under the Florida statute. Section 3212. Each complainant is in possession, and there is no doubt about the stat-

utory right of each to sue. Having the right to sue in equity under the statute, each complainant can implead all the defendant heirs for the purpose of adjudicating the complainants' title as a whole. Moreover, on the principle of general law that equity will grant complete and adequate relief, a court of equity will stay the ejectment suits against the single plaintiff who brings the ejectment. See Woods v. Monroe, 17 Mich. 238, where one person in possession of land with the complete legal title was held entitled to file a bill against parties who brought a number of ejectment suits against him for a portion of the premises described in the bill of complaint, but not all of the lands owned by the complainant under the same chain of title. Bispham's Equity, § 417. Each of these complainants could file this bill by representation on behalf of all others in like situation, or even by suing for himself alone on the doctrine of avoiding a multiplicity of suits. 1 Pom. Eq. Juris. (3d Ed.) § 255, p. 390; Osborne v. Railroad Co., supra. If they possess the equitable title, it must be true that each complainant could maintain this bill under the general principles of equity.

[15] Equity rule 26 provides that the plaintiff may join in one bill as many causes of action cognizable in equity as he may have against the defendant. It also provides that, when there is more than one plaintiff the causes of action must be joint, and if there be more than one defendant the liability must be asserted against all material defendants, or sufficient grounds must appear for uniting the causes of action in order to promote the convenient administration of justice. The proper construction of the second sentence of the rule is that the qualification "that sufficient grounds must appear for uniting the causes of action" applies to the plaintiffs and their causes of action, as well as to the defendants and their liabilities; and the reason for this construction is that the phrasing of the sentence plainly supports it, for the concluding clause "or sufficient grounds must appear," etc., qualifies and refers to both of the preceding statements in the sentence. The qualifying clause applies to cases where there is more than one plaintiff, as well as more than one defendant. This is consistent with rules 37 and 38. Rule 37 (198 Fed. xxviii, 115 C. C. A. xxviii) provides that:

"All persons having an interest in the subject of the action and in obtaining the relief demanded may join as plaintiffs."

By rule 26 the plaintiffs may join separate causes of action. By 37 all persons "having an interest in the subject of the action and in obtaining the relief" may join, and this right is not restricted by rule 37 to joint causes of action. Also, the last sentence of rule 37 permits "persons having a united interest" to be joined on the same side as plaintiffs. There is no requirement that their interest be joint. Rule 38 allows a suit to be brought by representatives of a class, when the question at issue is of common or general interest to many persons constituting a numerous class. This rule does not limit such suits to cases where the interests of complainants are joint. It follows, therefore, that, if rule 26 is to be construed in harmony with rules 37 and 38, it must be given the interpretation stated.

[16] Again, the rules and principles of equity practice, as they existed before the adoption of the present equity rules, undoubtedly

permitted several complainants having separate causes of action to unite in one bill of complaint, whether their causes of action were joint or not. The frequently cited cases of Shanks v. Klein, Crews v. Burcham, Osborne v. Railroad Co., Prentice v. Duluth Co., and Sang Lung v. Jackson, all supra, were instances where separate owners of separate parcels of land held under an equitable title joined in a single bill of complaint against numerous defendants. The complainants' causes of action there were similar, and they claimed under the same source of title; but they owned and sued for separate parcels of land, and their causes of action were not joint in any respect, but merely similar. It was never the intention of the Supreme Court of the United States that equity rule 26, or any other one of the new equity rules, should be construed so as to abolish any pre-existing equitable right or procedure, especially when helpful, as the proper practice in the present case and in those above cited. It was held in Low v. McMaster (D. C.) 255 Fed. 235, by District Judge Dickinson, that rule 26 does not abolish any former remedies. The purpose of the new federal equity rules was to simplify the practice and enlarge the discretionary powers of the trial court. It has been held, in Shapiro v. Franklin, etc. (D. C.) 272 Fed. 176, that one of the purposes of the new rules was to permit multifariousness. The construction which is applied to rule 26, being consistent with the spirit and purpose of the new rules, should be adopted.

[17] Exemplifying, it may be said, that an action brought by two or three owners of land in a church cemetery could join in the same bill to enjoin the church from removing bodies from the cemetery, action being brought by the complainants as representatives of a class under rule 38, is Chew v. First Presb. Ch. (D. C.) 237 Fed. 219. In that case the complainants' interests or causes of action were several and not joint; yet the action was not deemed in violation of rule 26. The rule, therefore, when it speaks of causes of action being joint, does not mean a technical legal privity, such as a joint contract; but the rule will be satisfied where, as here, there is a single question of law and fact common to all the complainants, or where they claim under a common source of title.

[18] As to the charge of misjoinder and multifariousness, it is to be observed that, where the purpose of the motion is to dismiss the entire bill for want of any equity, the court may ignore the grounds as to misjoinder or multifariousness, for they are not in themselves a sufficient predicate for dismissal for want of equity. Such objections stick in the bark and do not reach the merits of the cause. Multifariousness appeals to the discretion of the court in order to regulate the trial. It does not affect the equity of the bill as a whole. Considering the nature of this suit and the parties and property, the grounds of misjoinder and multifariousness here insisted upon may be said to be of so little moment that they might be disregarded. At the most, such matters are to be regulated by the court in taking the testimony or at the trial, and can be cared for without a dismissal of the bill.

But, if the objection be considered, then the bill is not multifarious on the ground that it does not join in the one suit entirely distinct and independent matters, each of which would be sufficient for the basis of a bill, for the parties are the same in view of the main object of the

bill, which is to quiet title, and there is similarity in the claims, those asserted by the actions of ejectment and those threatened to be likewise asserted by all the defendants under a common source of title—all against the complainants and those in like situation as the common adversary claiming under a common derivation of title—a title common in respect to all the parties, complainants and defendants. Emphatically the bill is for the enforcement of one general right for peace, and the fact that the defendants have different interests under their common right of title does not render the bill multifarious. It presents a common point, common to all the parties, for litigation; that is, whether the title originating by the Hudnall grant has descended to the defendants or has been transmuted to the complainants.

[19] The complainants are not—it is urged they are—guilty of laches. Laches cannot be imputed to one in possession of land under an equitable title for delay in resorting to a court of equity for protection against the legal title. The bill was filed when notice was given of the defendants' adverse claim by the suit at law. That was sufficient to protect the complainants against the plea of laches. Ruckman v. Cory, 129 U. S. 387, 9 Sup. Ct. 316, 32 L. Ed. 728; Brainard v. Buck, 184 U. S. 99, 22 Sup. Ct. 458, 46 L. Ed. 449; Seefeld v. Duffer, 179 Fed. 214, 103 C. C. A. 32.

The Hudnall grant, of which the lands here involved are a part, was the ganancial property of Ezekiel Hudnall and his wife, Elizabeth; at the time of his death there remained community debts unpaid, for the payment of which the widow had the power to sell, and did sell and convey, the entire grant to David Brown, under whom complainants claim, thereby vesting in Brown and his successors the equitable title to the whole of the Hudnall grant. The widow, being the surviving member of the marital partnership, had the right to sell the community property, as I will further on endeavor to show, for the payment of debts, and although her deed may not have passed the entire legal title, it was effectual as a conveyance of the equitable title that the plaintiffs now hold to the extent of their respective parcels of land. Shanks v. Klein, 104 U. S. 18, 26 L. Ed. 635.

Without the statutory provisions as to powers of a Florida court of equity, under sections 3212, 3213, Rev. Gen. Stats., giving the right to the holders of an equitable title, claiming under a common source, to file a bill in equity to determine their title, it is fundamental that courts of equity will entertain a bill to protect and enforce an equitable title. Therefore, if the conveyance from Mrs. Hendricks to David Brown on May 10, 1838, passed the equitable title, this court has jurisdiction of the bill in support of that equitable title, as against the heirs of Ezekiel Hudnall, who, at the most, hold the bare legal title, and in trust for the plaintiffs. If the plaintiffs hold such an equitable title, and I think they do, then by ineluctable logic this bill has equity. Furthermore, as this bill in one aspect is to enforce equitable titles, the suit rests on the original equity power of this court, independently of state statute, and regardless of the multiplicity of suits or special equities. Seefeld v. Duffer, 179 Fed. 214, 218, 103 C. C. A. 32; Lonsdale Co. v. Moies, 15 Fed. Cas. 860, No. 8,496.

Moreover, that an equitable title might be pleaded in the ejectment suits under the Florida statute does not deprive the complainants of their right to file a bill in equity to have such equitable title established. Camp v. Boyd, 229 U. S. 530, 33 Sup. Ct. 785, 57 L. Ed. 1317; Crews v. Burcham, 1 Black, 352, 17 L. Ed. 91; Seefeld v. Duffer, supra; Hobbs v. Chamberlain, 55 Fla. 661, 45 South. 988. And, the complainants being the holders of the equitable title to their separate parcels, each is entitled to enjoin the ejectment suits pending the adjudication of their equitable title against all the defendants. Crews v. Burcham, supra.

Concerning multiplicity—all of the plaintiffs, except A. G. and W. E. Cummer, who are warrantors of the city of Jacksonville, have been subjected to separate ejectment suits by two of the Hudnalls, making a total of 10 such suits. The mathematics is that, if all the Hudnall heirs joined as defendants in this bill brought similar suits, there would be 30 actions of ejectment against the plaintiffs. The nature and effect of these suits here enjoined and those which are threatened have been stated. It is plain that there are existing and imminent numerous suits, and for that reason, as one of the grounds, the jurisdiction of equity is invoked. The nature of such jurisdiction is stated in 1 Pom. Eq. Juris. (3d Ed.) pp. 225, 360, which is so well understood that it is not necessary to now quote the text.

[20] The rule is that equity has jurisdiction to restrain the prosecution of a multiplicity of suits at law, and where the plaintiffs are united by a common tie, created by identity of interest in the decision of the same questions of law and fact, where the party defendant is a common adversary, and the actions are so numerous that their prosecution would visit great inconvenience, hardship, and expense upon the defendant in such law actions. The aim is to prevent a multiplicity of suits, so as to give to the owner of the property the benefit and enjoyment of the ownership, rather than fritter it away in many suits. In this case, all the complainants and those in like situation who may join are dependent upon a common source of title, and the same essential facts as to title exist in the case of each of them. They do not have a common right, as distinguished from a common source of title; but there is a community of interest, in that the title of each complainant is derived from the same common source. All these things being true, the complainants may join in this suit, having for its ultimate object the quieting of their title and removing the cloud therefrom created by the ejectment suits brought and those threatened. It is no answer to say that, where each of these plaintiffs could make its or his defense in each of such law cases, that is a sufficient reason to shut them out of a court of equity, for their defense in the law court is not adequate, considering all the facts and circumstances presented.

It is a favored principle of the court of equity that it will extend complete and adequate relief, even where a court of law can give partial relief, or relief which is not as appropriate or satisfactory as that afforded by a decree in equity. The equitable jurisdiction exists under such circumstances, even though it may result in the court determining strictly legal rights and granting legal remedies in connection with its

admitted jurisdiction. These principles are confirmed in Camp v. Boyd, supra; McGowan v. Parish, 237 U. S. 285, 35 Sup. Ct. 543, 59 L. Ed. 955; Woods v. Monroe, 17 Mich. 238; Boone v. Byrd, 201 Ala. 562, 78 South. 958; 4 Pom. Eq. Juris. (3d Ed.) § 1362. And it is said (Boyce v. Grundy, 3 Pet. 210, 215, 7 L. Ed. 655), that "it is not enough that there is a remedy at law," unless the remedy there is "as practical and efficient to the ends of justice and its prompt administration, as the remedy in equity." In Cruickshank v. Bidwell, 176 U. S. 73, 81, 20 Sup. Ct. 280, 283 (44 L. Ed. 377), it is said that:

"Inadequacy of remedy at law exists where the case made demands preventive relief, as, for instance, the prevention of a multiplicity of suits."

Here the defense in one of the separate actions at law, which has been brought or may be brought by the defendants, would determine nothing beyond the respective rights of the parties in that particular case as against each other; and such a contest in each of the 10 actions brought, and the possible thousands threatened to be brought, would lead to interminable litigation and to such confusion as to amount wellnigh to a public calamity to a community of several thousand citizens and owners. The cases cited by defendants are those which asserted that a community of interests in the subject-matter is necessary to sustain a bill of this sort, and Tribette v. Illinois Central, 70 Miss. 182, 12 South. 32, 19 L. R. A. 660, 35 Am. St. Rep. 642, and Illinois Steel Co. v. Schroeder, 133 Wis. 561, 113 N. W. 51, 14 L. R. A. (N. S.) 239, 126 Am. St. Rep. 991, were relied on. Such cases are upon the principle that there must be a common interest in the subject-matter; but as is said by the editor of the note in 131 Am. St. Rep. at page 40:

"The federal courts have very generally upheld the principle that a mere community of interests in the question of law and fact involved in the controversy is sufficient to justify the exercise of equity jurisdiction to prevent a multiplicity of suits."

See Hale v. Allinson, 188 U. S. 56, 23 Sup. Ct. 244, 47 L. Ed. 380.

The doctrine relied upon by defendants, and supported by the Tribette and Schroeder Cases, has been rejected in numerous federal court cases. Montgomery L. & P. Co. v. Charles (D. C.) 258 Fed. 723, and authorities there cited. Accepting the test stated by Justice Peckham in Hale v. Allinson, supra, there can be no reasonable doubt that the complainants' titles are sufficiently connected by identity of law and fact to justify the complainants in bringing this bill, and including therein the filled-in marsh lands; for I think a common interest in a single controlling issue is sufficient ground to support a bill to settle or avoid a multiplicity of suits, and that it is not indispensable that all parties should have an interest in every matter contained in the bill—the single issue of law and fact being the paramount and determining factor in the equation.

[21] It was insisted in the argument by the defendants that the bill is multifarious and bad, if, in addition to the cause of action based upon the common source of title of complainants, the bill contains any other cause of action. It was argued that the bill was bad because, as it was said, it alleges title based upon adverse possession, as well as the equities flowing from the surviving partner's deed, estoppel, and pre-

sumed grant. It was also urged that not all of the complainants owned filled-in lands, which, it was contended, were held under the riparian act, and therefore the bill introduced separate claims not common to all of the complainants. As elsewhere noted, the claims of title based on the ganancial deed, estoppel, and presumed conveyance are merely different aspects of a single title, and not objectionable under the strictest equity practice. Stephens v. McCargo, 9 Wheat. 502, 6 L. Ed. 145.

But the criticism of the bill is not well founded. It cannot be an objection to a bill in equity that it contains more than a single cause of action or issue of law and fact, if all the parties have an interest in the one and same cause of action, and the other issues or causes are reasonably connected therewith. It has been held by the Supreme Court of the United States that:

"It is not indispensable that all the parties should have an interest in all the matters contained in the suit; it will be sufficient if each party has an interest in some material matters in the suit, and they are connected with the others." Brown v. Guarantee Trust Co., 128 U. S. 403, 412, 9 Sup. Ct. 127, 130 (32 L. Ed. 468).

A court of equity should not refuse to put at rest this controversy, actual or threatened, and determine the extent of the right of the defendants as claimants, and the complainants and those in like situation, all asserting distinct interests in a common subject, or in a part of a common subject; that is, to rights under the Hogans Spanish grant asserted by the defendants at law, and to parcels of the land of the same grant asserted by the complainants here, under a title derived from the same common source, and in its turn running back to the same Spanish grant.

In disposing of the objection that this bill seeks to deprive the defendants of a trial by jury, it must be repeated that the plaintiffs in the ejectment suits, Charles F. and Mary E. Hudnall, and these complainants, assert title to the land, the common subject-matter, and under a common source of title, and that the facts of the case must be taken as stated in the bill. The case is therefore reduced to questions of law. And so, if it were remitted to the law court, it would be difficult to imagine that even there the controversy would not be reduced to a question of law, and that it would, therefore, go off on the peremptory instruction of the court. However that might be, in Hale v. Allinson, supra, the court said, and it is pertinent here, that:

"Each case, if not brought directly within the principle of some preceding case, must, as we think, be decided upon its own merits and upon a survey of the real and substantial convenience of all parties, the adequacy of the legal remedy, the situations of the different parties, the points to be contested, and the result which would follow if jurisdiction should be assumed or denied; these various matters being factors to be taken into consideration upon the question of equitable jurisdiction on this ground, and whether within reasonable and fair grounds the suit is calculated to be in truth one which will practically prevent a multiplicity of litigation, * * * and will not unreasonably overlook or obstruct the material interests of any."

This court has the authority to entertain jurisdiction of the case presented by the bill, upon the ground that it will prevent a multiplicity of suits. It is not deemed necessary to cite the numerous cases collated. They are illustrative of the soundness of the principle and its applica-

bility to the bill as a measure to prevent a multiplicity of suits. Let Bailey v. Tillinghast, 99 Fed. 809, 40 C. C. A. 101, suffice. I may add that the Supreme Court of the United States, in Bitterman v. Railroad Co., 207 U. S. 205, 28 Sup. Ct. 91, 52 L. Ed. 171, 12 Ann. Cas. 693, adopted this rule, for it will be remembered that suit is commonly called the "scalpers' case," and there a single party brought suit against numerous ticket brokers who had no connection with one another, and the jurisdiction was sustained because the same question of law and fact would determine the litigation.

As the case is presented, the complainants' source of title, if sustained by the decree, would not only dispose of the pending ejectment suits, but those that are threatened, and prevent much harassing and costly future litigation. Such decree would unfetter the rightful owners of the land in the free use and enjoyment of their property.

Further, as to multifariousness, it is here urged against the union of causes of action and of parties whose claims it is either impracticable or inconvenient to hear and adjudicate in a single suit. The objection goes to the form and not to the substance of the bill. Such an objection concedes the equity of the bill, but attacks because of the alleged inconvenient joinder of parties and causes of action. The objection is accordingly based upon mere matter of convenience in the trial of a case which, under the doctrine of ex concessis, has equity. All the courts have announced that multifariousness is to be determined by the peculiar features of each case and that the court will exercise a sound discretion of the rule. Boyce v. Grundy, supra; Cruickshank v. Bidwell, supra. And also it is established that no rule of practice or procedure is less uniform in its interpretation and application. Shields v. Thomas, 18 How. 253, 15 L. Ed. 368; Gains v. Chew, 2 How. 619, 11 L. Ed. 402; Westinghouse, etc., Co. v. K. C. S. Co., 137 Fed. 26, 71 C. C. A. 1. The Circuit Court of Appeals said in the last case that:

"Where it is as practical and convenient for the court and parties to deal with the claims and parties joined by a petition in one suit as in many, there is no multifariousness."

It was also held that the union of two or more causes of action for the same demand or the same relief does not render a bill multifarious. Multifariousness, therefore, presents a question of convenience, and its application in each case will be governed by practical and not by theoretical considerations. Jaros, etc., Co. v. Fleece Co. (C. C.) 60 Fed. 622; Harper v. Holman (C. C.) 84 Fed. 222.

In view of what has been said, and considering the nature of the case and facts presented, there seems to me to be no doubt that this bill of complaint is the most convenient method for presenting the causes of action of the several complainants against each and all of the defendants. And as multifariousness includes misjoinder of parties as well as subject-matter, the objections of misjoinder of plaintiffs and defendants and the joinder of separate parcels of land, different sources of common titles, and the existence of the filled-in land, hereafter adverted to, adjacent to and really a part of the uplands and held by the same title, are no more than matters of convenience, and to be determined in the discretion of the trial court. Besides, the doctrine of preventing by

bill in equity a multiplicity of suits is an exception to the doctrine of multifariousness as to the subject and parties.

Considering a further objection, it must be observed that the bill refers to the adverse possession of the complainants as a part only of the equity of estoppel against the defendants. There is no prayer to declare the title in the complainants under the statute of limitations alone. The limitation as to all of the complainants and all other persons in like situation may have begun under the holding of possession of the lands by the common source of title of all the complainants. But, even if a claim of title under the statute of limitations or adverse possession was made by complainants as a distinct claim of title, that would not render the bill without equity, for where the court of equity obtains jurisdiction by reason of any of various equities including estoppel stated in the bill, the court, to give complete and adequate relief, may also consider and determine the legal title arising under the statute of limitations. In Sharon v. Tucker, 144 U. S. 533, 12 Sup. Ct. 720, 26 L. Ed. 532, involving lands in the city of Washington, the title by adverse possession was held to be a sufficient base for a bill in equity against the descendants of Tucker to prevent cloud on the complainant's title because of the claim of the heirs of Tucker.

[22] Further, as to the now filled-in marsh, the fact that a part of the property of some of the complainants consists of filled-in or made lands does not alter the situation, because the ownership of such lands necessarily depends upon the title to the uplands. The title to the filled cannot be proved, without proving the title to the uplands, and vice versa. Not only are the filled-in lands inseparably annexed to the uplands, both physically and legally, but the identical questions of title apply to each. Hence, as to this made-dry land, the same common title and the same questions of law and fact which unite the complainants' rights as to the upland are not only controlling, but necessary to any determination of the title. The identity of law and fact and the community of interest between the complainants is as applicable to one class of land as to the other. Furthermore, a part of the lands claimed by some of the complainants have been filled in below high-water mark. It does not appear, and cannot be shown, what part of these lands was below the high-water mark; for the line separating the upland from the filled-in lands is indistinguishable after the lapse of more than 60 years. Not only is there no separation of these lands in the bill, where they are all described as a part of the upland, but it is physically impossible now to determine the location of the original high-water line.

The Act of the Florida Legislature of December 27, 1856 (Laws 1856, c. 791), granted to the "riparian proprietors" all lands then covered by water lying in front of "any tract of land owned by a citizen of the United States," etc., as far as the edge of the channel, giving the riparian proprietors full right to wharf out and fill up the shore, etc. The statute was applied by the Supreme Court of Florida in numerous cases before 1918, without indicating that the riparian proprietor mentioned in the statute was one who owned to high-water or low-water mark. Rivas v. Solary, 18 Fla. 122; State v. Black River Phos. Co., 27 Fla. 276, 9 South. 205; Id., 32 Fla. 82, 13 South. 640,

21 L. R. A. 189; Dumas v. Garnett, 32 Fla. 64, 13 South. 464; Merrill, etc., Co. v. Durkee, 62 Fla. 549, 57 South. 428. Since these and other like decisions it was held for the first time in 1918 in the cases cited below that, under the second section of the act of 1856, the riparian proprietors were those who held title to low-water mark, and that the act did not apply to titles which extended only to high-water mark. Thiesen v. Gulf, etc., Co., 75 Fla. 28, 28 South. 491, L. R. A. 1918E, 718; Brickell v. Trammel, 77 Fla. 544, 82 South. 221.

[23] By the common law riparian proprietors generally owned only to high-water mark. Therefore, under the two decisions last cited, the Riparian Act of 1856 would not extend to all riparian owners as indicated by the first section of the statute. Certain of the complainants and their predecessors in title, like any other riparian proprietors, filled in their lands before 1918, and the decisions in the Thiesen and the Brickell Cases. Further comment is not necessary, for these two cases had no reference to filled-in lands as extended from uplands. In 1921 the Legislature passed a new Riparian Act (chapter 8537), which is in almost identical language as the act of 1856, except that it expressly provides that the riparian proprietors shall include those who own only to high-water mark. The third section of such act of 1921 provides that the act shall take effect as of December 27, 1856, when the former Riparian Act was adopted—

"and shall be continuously effective thenceforward and hereafter, and hereby vests in the riparian proprietors and their grantees and successors, in right, the title, right and interest given under the provisions of this act."

The purpose of the act was manifestly to confirm the accepted meaning of the act of 1856, and to abrogate the rule stated in the Thiesen and Brickell Cases. The act of 1921 operated to vest in riparian proprietors of the uplands the lands between high and low water mark as a right appurtenant or annexed to the riparian lands with the right to fill, improve, etc. It also expressly confirmed to the riparian proprietors as they existed in 1856, and their successors in title, the improvements which had been made prior to 1921. In State v. Black River Phosphate Co., 32 Fla. 82, 112, 13 South. 640, 649, 21 L. R. A. 189, it was said that:

"The statute * * * annexes to the title to the riparian land the ownership, of the land granted by it out to the channel."

It was also held that a conveyance of land to which riparian rights are attached under the statutes will carry the riparian rights without an express description of the riparian rights, unless a contrary intent appears from the deed. Panama, etc., Co. v. A. & St. A. B. Ry., 71 Fla. 419, 71 South. 608. The grant was not to individuals by name, but to a class of riparian owners, because of their ownership of the upland fronting on the water. The rights given by the state were like the right of accretion; they pertain to the title to the riparian land and are inseparably annexed thereto. No ownership or right in the riparian rights or filled-in lands could be established, without proving the title to the uplands. The defendants have insisted that, because the title to the filled-in lands and riparian rights of such of the complainants

as own water front property came from the state of Florida, the bill of complaint is bad, for that, arguendo, it constitutes two separate and distinct titles and rights introduced into the litigation—that the bill is multifarious as to subject-matter, since the title derived by the complainants from David Brown is not the title by which complainants hold the riparian rights or own the filled-in lands. The objection is resolved into a mere matter of multifariousness, which is a question of convenience, and under the authorities referred to the court has the discretion to ignore the objection, if it appears that the bill in its present form best subserves the convenience of all parties in this litigation. As pointed out herein, the title to the riparian lands depends upon exactly the same facts and law as the title to the uplands. One cannot be established without proving the other. Hence the joinder of the two titles, even if they are separate, does not result in any real inconvenience. On the contrary, it is the best, if not the only common-sense, way to determine the title to complainants' lands. The objection being highly technical, it should yield to the plain necessity of the situation.

In addition, if the given construction of equity rule 26 is correct, the present objection is entirely without merit. It has been held under rule 26 that two mortgages may be foreclosed in a single suit. Crawford v. Railroad, 233 Fed. 961, 147 C. C. A. 635. The purpose of the rule was to abrogate the former strict rules regarding multifarious pleadings. Marcus, etc., Co. v. Feldman (D. C.) 269 Fed. 306; Shapiro v. Franklin, supra. As the joinder of all these matters obviously promotes the convenient administration of justice, the rule applies. Much was said in argument about the effect of the act of 1921; but this objection would have the same weight under the act of 1856. In the nature of the grant and in the resulting title to filled lands the two acts differ in no respect. In the 66 years which have elapsed since the passage of the act of 1856, this question has never been raised in the Supreme Court of Florida in the numerous cases which have been before the court, and that court has repeatedly quieted titles and granted other equitable relief under bills of complaint which united the upland and the filled-in land. The objection under consideration would apply as well to a suit by one complainant as to this suit brought by several. Thus, if one of the complainants owning on the river front filed a single bill against these defendants (as it or he undoubtedly might do), it might be argued that the bill was bad, because it united uplands and filled-in lands, which the complainants claim by a different title. The fact that the lands were in such situation would, if the objection is sound, bar the complainant from any relief in equity under the Florida statute or otherwise.

Such result demonstrates the unsoundness of the contention; for as to the upland and the filled-in land alike the complainants hold under a common title, from David Brown, and as to all such property the same questions of law and fact are to be determined. No new question is introduced in the litigation by the act of 1856 or the act of 1921. Whoever owned the title to the riparian lands on December 27, 1856, became entitled under both acts to the riparian rights and the filled-in

lands. Therefore the establishment of the title to the uplands in 1856 is necessary to determine the ownership of the filled-in lands and the riparian rights. Consequently the existence of filled-in lands or riparian rights imports nothing new, for a determination of the title to one class of property is decisive of the title as to the other. Furthermore, as said, this question of title is common to all the complainants, and their common source of title is opposed to the claims of all the defendants. It cannot be maintained that the complainants owning the water front property will have to inject in this case any new facts or questions of law. If the David Brown deed is valid for any of the reasons alleged in the bill, all of these questions about riparian rights and filled-in lands disappear. This is true, not only for the practical reason that both upland and filled-in lands are not separated, and cannot be, either physically or legally, but also because a court of equity will take jurisdiction of every related question affecting the subject of its jurisdiction, and settle all to prevent a multiplicity of suits and afford complete relief. 4 Pom. Eq. Juris. (3d Ed.) § 1362; Boone v. Byrd, 201 Ala. 562, 78 South. 958.

Where the controversy, in addition to its legal aspect, involved some equitable estate, right, or interest which is exclusively cognizable by a court of equity, so that a complete determination cannot be made by a court of law, it is well settled that equity not only may, but must, interfere at the suit of the party in whom the equitable estate or right is vested, and restrain the action at law and decide the whole controversy. Pom. Eq. § 1362. A court of equity ought to do justice completely and not by halves; and a cause, once properly in a court of equity for any purpose, will ordinarily be retained for all purposes, even though the court is thereby called upon to determine legal rights that otherwise would not be within the range of its authority. McGowan v. Parish, 237 U. S. 285, 35 Sup. Ct. 543, 59 L. Ed. 955; Woods v. Monroe, 17 Mich. 238; Olsen v. Williams, 172 Mich. 316, 137 N. W. 687.

In Camp. v. Boyd, 229 U. S. 530, 33 Sup. Ct. 785, 57 L. Ed. 1317, it was held that, where a party was sued in ejectment for a tract embracing three lots, two of which he held by an equitable title, and one by a legal title, he could sue in equity to enjoin the ejectment suits as to the whole property on the ground that equity would grant complete relief. Here complainants have been sued in ejectment for all of their lands, including riparian rights and filled-in lands. Complainants have an undoubted right to file this bill for equitable relief to avoid a multiplicity of suits, and to establish their titles to the uplands and enjoin the ejectment suits. The fact that annexed to the uplands of certain complainants are filled-in lands or riparian rights cannot defeat the jurisdiction of equity to grant relief as to complainants' lands in their entirety, especially when the ejectment suits seek to recover the property in solido, and, furthermore, where the chain of title to the uplands proves the ownership of the riparian rights or filled-in lands. It would be impossible to grant complainants the relief they claim without determining the title to the riparian rights and filled-in lands. The ejectment suits treat the property as an entirety, and the court cannot

enjoin ejectment suits in part, because there is no way to determine the high-water mark in 1856. Besides, being of right in a court of equity, such court will proceed to determine all of the cognate and inseparable questions involved in the controversy.

The objection to the bill that there is misjoinder of defendants is untenable. The defendants claim as cotenants; hence they are joined by privity of estate, and in this case they are as if only one claimant. Each complainant has a cause of action against *all* the defendants. All the complainants have a common source of title against each and all the defendants. The same questions of law and fact which determine this title affect all the defendants. Equity rule 26 permits the joinder of these defendants, even under defendants' own construction of the rule; it being manifestly advantageous, as well as necessary, to implead them all in one suit. In bills based on multiplicity of actions, all these defendants can and must be joined. Western L. Co. v. Guinault (C. C.) 37 Fed. 523; Mont. L. & P. Co. v. Charles (D. C.) 258 Fed. 723; Preteca v. Maxwell, etc., Co., 50 Fed. 674, 1 C. C. A. 607; De Forest v. Thompson (C. C.) 40 Fed. 375; 1 Pom. Eq. Juris. (3d Ed.) p. 445; L. & N. v. Smith, 128 Fed. 1, 63 C. C. A. 1; Hale v. Allinson, 188 U. S. 56, 23 Sup. Ct. 244, 47 L. Ed. 380; Hyman v. Wheeler (C. C.) 33 Fed. 629; Dodge v. Briggs (C. C.) 27 Fed. 160. Florida Rev. Gen. Stats. § 3212, expressly sanctions the practice. As to the filled-in or made lands, the same conclusion follows. The defendants' claims are joint, and exist by virtue of the same source of title. Likewise complainants claim under the same source of title and identical questions of law and fact as against all of the defendants, together as well as individually. Clearly the effective exercise of the jurisdiction of this court requires all the defendants to be joined as parties to this bill.

[24] The motions of Charles F. and Mary E. Hudnall "to dismiss all those parts of the bill herein as to each and all of the prayers for injunctive relief as to all pending ejectment suits, and all allegations of said bill as to such pending ejectment suits," cannot be entertained, because these motions do not specifically designate the part or parts of the bill to be dismissed or stricken. The motions do not quote the parts to be stricken, or designate the same by page and line. Although there appear to have been no decisions under equity rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi) as to the form of such a motion, it is said of this rule in Simpkins' Federal Equity Suit, p. 401, that:

"When the objection to the rule goes only to a part [of the bill], such part should be set forth in the motion, and should be pointed out with such certainty as to give such specific information as to what part the defendant would not be required to answer, if the prayer of the motion be granted."

In support of this are cited Miller & Lux v. Rickey (C. C.) 123 Fed. 604, Ormsby v. Union R. (C. C.) 4 Fed. 170, and Chicago, etc., Co. v. Macomb (C. C.) 2 Fed. 18. These cases were decided before the adoption of rule 29, but it has always been true that the part of a bill or answer objected to must be specifically designated in a special demurrer or exceptions. Story's Eq. Pl. § 457, and Everglades, etc., v.

Broward, etc. (D. C.) 253 Fed. 247, where (page 255) Judge Call for all three of the judges, said:

"The twelfth ground of the motion undertakes to reach certain portions of the bill, by setting out the effect of the portions to which it refers. This is not, I think, good practice. As I understand the law, the court cannot be required to wade through an entire pleading to find out what portion is attacked by the motion. For this reason I have not considered the twelfth ground."

Let us now consider the marital partnership of Ezekiel and Elizabeth Hudnall in Florida and the rights and powers of the surviving spouse. The bill shows that Daniel Hogans acquired from Spain in 1817 the whole of the Hudnall grant, the lands involved here, and that Ezekiel Hudnall purchased the same from Hogans for $330 in 1818, during the time of the marriage existing between Ezekiel and Elizabeth Hudnall, and the bill also states that the Hudnall grant was the common and ganancial property of Ezekiel and Elizabeth Hudnall, and that after Ezekiel's death Elizabeth, the surviving widow, sold it for $700 to pay the common debts alleged in the bill to have existed, and that pursuant to such sale she (Elizabeth) by warranty deed and for the purpose and consideration named, conveyed the whole equitable title in the lands to David Brown, the common predecessor in title of the complainants.

[25] Taking as true the facts recited, the weight of authority supports the conclusion that the property acquired by title of purchase during the marriage was ganancial, that the ganancial property is first bound for the payment of debts contracted during the existence of that relation; that the acts and conduct of the widow, Elizabeth, in the sale of the property to pay debts and in executing the deed conveying the property to David Brown, were authorized under the Spanish law, and that by such deed David Brown acquired the equitable title. It is not disputed that there were debts to be paid by the surviving spouse, Elizabeth; Ezekiel having died about the year 1824 or 1825. In 1838, some 14 years after the demise of her husband, Elizabeth made the fee-simple title deed to David Brown. The children of Ezekiel and Elizabeth were all of age in 1834 or 1835. They made no effort to recover these lands within 20 years after the death of their father. The case now is that their grandchildren have brought the actions enjoined, asserting an interest as the heirs of their father, and this is 97 years after the death of the grandfather, Ezekiel.

Under the Spanish and the Florida law which took its place, the surviving spouse, Elizabeth, had the right to convey the lands to Brown, by virtue of the legal principles applicable to ganancial property, as well as under like principles applicable to conventional partnership property adopted by analogy to ganancial property, and the defendants in this suit, heirs of Ezekiel Hudnall, have no title to the land in controversy which can be the foundation for a claim against the successors in interest of the grantee of Elizabeth Hudnall, the surviving spouse, and the grantor to David Brown.

The argument is that, as the Hudnall grant was a Spanish grant, acquired by Ezekiel Hudnall by purchase during the existence of his mar-

riage with Elizabeth, while East Florida was a Spanish province, consideration must be accorded to construction placed by the statutes and decisions of the state of Florida upon the Spanish law applicable to such purchases in the province, prior to the change of flags, and the property rights of husband and wife under such law. Such property rights were preserved under the new sovereignty, and were expressly declared to have been so preserved by the act of the territorial Legislature of 1824 (Pub. Act of Territory of Fla. 1839, p. 45) entitled "An act to secure rights to property of husband and wife, derived previous to the cession of the provinces of Florida to the United States." This is still the law of the state. Rev. Gen. Stats. 1920, § 3946.

There are two cases decided by the Supreme Court of Florida which have bearing upon the one at bar. The first is McHardy v. McHardy's Executor, 7 Fla. 301. There the surviving executor of the husband filed a bill in equity against the creditors, devisees, and other claimants, asking advice as to the administration and disposition of a sum of money on hand belonging to the estate. The wife of the testator in that case died first, and two of the children of the marriage demanded one-half of the ganancial property in the right of their mother as against the common creditors. The court held that the debts which are contracted during the marriage are to be paid out of the common property, and in denying the claim of the children said in part:

"A claim asking all the common property, the gains and profits to the exclusion of the losses and in disregard of the joint responsibilities of a joint concern, asserted against these having a fair right to be remunerated out of it, is not entitled to the favorable regard and consideration of a court of equity."

MaGee et al. v. Doe ex dem. Alba et al., 9 Fla. 382, was a case involving the right of a widow in lands purchased by her husband in 1817, and during the existence of the marriage. The lessees of the widow and heirs of the deceased husband brought a suit in ejectment against parties in possession claiming adverse title, and among the objections raised by the defendants was that the widow had no interest in the land involved. It was insisted on behalf of the widow that, the lands having been acquired by purchase during the marriage, under the Spanish law the widow was the legal owner of an undivided half of the lots. It was said that—

"The courts of Florida have frequently adjudicated upon these rights of husband and wife under the Spanish law, and uniformly held, as laid down by Mr. White, in his New Recompilacion, vol. 1, page 61, that marriage so far as property is considered, is to be considered in the light of a contract of partnership. The right to ganancias is founded on the partnership or society which is supposed to exist between husband and wife. That ganancial property is all that which is increased or multiplied during marriage. By multiplied is understood all that is increased by onerous cause or title, and not that which is acquired by lucrative one, as inheritance, donation, etc. Says Mr. White: 'From all which it is inferred: (1) That what the husband or wife bring into marriage, as their own peculiar property, or acquire during it by lucrative cause or title, does not come into partition. (2) But that the property acquired during marriage by purchase, sale, or other onerous cause or title, does. (3) That immediately upon a division being made of this ganancial property, each acquires an absolute dominion as to their respective moieties or proportions. (4) That as the gains (ganancias) are common,

so also are the injuries or damages which shall happen to them, unless they arise by the fault of only one of the partners.' These rights and privileges of husband and wife have been secured by the Legislature of Florida. See Thompson's Digest, p. 220; Saul v. His Creditors, 5 Cond. Rep. Sup. Ct. Louisiana, 663. This being the law governing the interest of Constance Alba, the wife and one of the lessors of the plaintiff, in these premises, it will be seen that she is not entitled directly to one-half of the land, but, being entitled to one-half of the gains during the marriage, and lands purchased being considered gains, these lots come into partition, and, upon a' division being made, each would acquire absolute dominion. Without undertaking to decide what the extent of interest may now exist as between the said Constance Alba and the remaining lessors of plaintiff in these lots, it is only sufficient for us to decide that by the Spanish law in force in this state she has secured to her an interest in common with her late husband's heirs or heir, and that she has an interest in these lands, in connection with the derivative title through her husband, sufficient to make her joinder as one ʳf the lessors of the plaintiff, proper and legal."

[26] The McHardy Case, supra, and the MaGee Case, supra, appear to be the only adjudications on this point by the Supreme Court of Florida, so that the frequent decisions referred to in the opinion in the MaGee Case, must have been either nisi prius decisions, or decisions by the territorial Court of Appeals, and they are not reported. It is unnecessary to determine whether, under the ancient Florida cases quoted from, there is a complete analogy between the ordinary conventional partnership and that existing between husband and wife as defined by the Supreme Court of Florida. It is sufficient that, upon the dissolution of the marital partnership by death, the relation of the survivor to the property and to the debts was so similar to the relation of the surviving partner of a conventional partnership as to carry the same duties and equitable rights—the duty to pay the common debts and the right to dispose of the real estate for that purpose. As in the case of the commercial partnership, so also it was in the case of the marital partnership, all of the common property is subject to all of the common debts, and it is only the gains that come into the partition between the survivor and the heirs of the deceased spouse. If there be no surplus over and above the debts, then there can be no gains to partition. The Supreme Court of Florida, as well as the Supreme Court of the United States, has each recognized the right of a surviving partner of a commercial partnership to sell and convey partnership real estate for the purpose of paying partnership debts. Loubat v. Nourse, 5 Fla. 350; Shanks v. Klein, 104 U. S. 18, 22, 26 L. Ed. 635. This right does not exist by virtue of any statute but is a familiar and enforceable principle of equity. In Shanks v. Klein, supra, in referring to this right of the surviving partner to sell real estate, it was asked and answered:

"What is that right? Not only that the court will, when necessary, see that the real estate so situated is appropriated to the satisfaction of partnership debts, but that for that purpose, and to that extent, it shall be treated as personal property of the partnership and like other personal property pass under the control of the surviving partner. This control extends to the right to sell it, or so much of it as may be necessary to pay the partnership debts, or to satisfy the just claims of the surviving partner."

The Florida court has described the debts contracted during marriage as the "joint responsibilities of a joint concern." It has declared common property to be subject to the common debts. Until the common

debts are paid, there are no "ganancias" or gains to divide. Both upon reason and upon authority the deed made to David Brown by Elizabeth, the surviving widow of Ezekiel Hudnall, must be held to have conveyed the entire equitable title of the Hudnall grant; and the only title, if any, held by the heirs of Ezekiel is a bare legal title, held in trust for the grantees of David Brown, which a court of equity will require such heirs to convey to grantees of David Brown. Loubat v. Nourse, supra; Shanks v. Klein, supra.

[27] Indeed, the defendants cannot at this late day question the deed from the surviving spouse of Ezekiel Hudnall to David Brown. It was executed in 1838, more than 80 years ago, for the valuable consideration of $700. This deed was not challenged by any of the defendants for more than 75 years. Such acquiescence constitutes a construction favorable to the power of Elizabeth to make the deed, and in good conscience the defendants cannot now repudiate the efficacy of such instrument.

[28] I think that the defendants are estopped from denying the validity of the deed of Elizabeth Hendricks (formerly Elizabeth Hudnall, the widow) to David Brown under whom all these complainants now claim. The facts are fully set forth in the bill. The occupation, development, and use of particular tracts of the Hudnall grant owned in severalty by the complainants are described and constitute the basis of the estoppel to deny the validity of the deed from said Elizabeth to Brown. These facts are not alleged merely for the purpose of showing an estoppel against the defendants to claim the particular tracts so occupied and owned in severalty, but are alleged also as matters which show a ratification of the deed that operates to the benefit of all persons who claim under it.

[29] In respect to each of the grantees of the deeds in the several chains of title, the grantee was put into possession of the land by the grantor, and thereafter the grantee claimed and held exclusive possession and dominion hostile to these defendants, and thenceforward such grantee continuously claimed indefeasible fee-simple title to said parcel in his own right until such grantee executed a deed of conveyance and delivered the actual possession and dominion over such parcel of land to the succeeding owner in the chain of title. On the part of each grantee in the several chains of title, beginning with that from David Brown in 1838, and from that time on to the present, the claim and title has been exclusive of every claim, right, and title under said Henry Hudnall and Eliza Bagley (née Hudnall), and their heirs, descendants, and all other persons now claiming or who might have claimed under them or either of them. Further, the defendants had at least constructive knowledge of the complainants' claim, occupation, and use of the lands by the complainants and their predecessors in title under claim of ownership, at all times notoriously asserted and employed. These things being true, such knowledge will be imputed to these defendants, just as if they had had actual knowledge. It appears from the American State Papers, read in this hearing by the defendants without objection, that the heirs at law of Ezekiel Hudnall obtained constructive knowledge of their interest in the Hudnall grant as early as 1825.

The bill also alleges that Elizabeth Hendricks (Hudnall), the grantor of David Brown, resided in Duval county, Fla., continuously from 1838 to some time subsequent to 1865, and that during that period she was in communication from time to time with her children, Henry Hudnall and Eliza Bagley, the respective grandparents of the respective defendants. It is further stated that Eliza Bagley during her lifetime, her children, Mary Prevatt and Elizabeth Ann Henderson, and their children and devisees, who are the defendants to this suit, including Dorothy Harris, a grandchild, resided in Duval county, Fla., until recent times, and that such of them as were living in the lifetime of George Hudnall, Francis Hudnall and Emily Donaldson (née Hudnall), children of Elizabeth Hudnall, had frequent communication with said George, Francis, and Emily. Again, it is averred that George, Francis, and Emily, in 1851, executed deeds of quitclaim to John Brantley, grantee of David Brown, and that consequently these parties knew of the deed from Elizabeth Hendricks to David Brown.

As to Milo Hudnall, father of defendants Charles F. and Mary E. Hudnall, it seems that, about the time George Hudnall, Francis Hudnall, and Emily Donaldson quitclaimed their interest to John Brantley, said Milo lived with his uncle, Francis Hudnall, on the south bank of the St. Johns river, opposite to and in plain sight of the Ezekiel Hudnall grant, and that in 1854 said Milo was engaged in the mercantile business in Jacksonville, Fla., and sold goods to the inhabitants there and of that vicinity for several years, at a period when the chief business of the community was the manufacture and sale of lumber at the mills located on the Hudnall grant; that, after leaving Jacksonville, Milo Hudnall visited his relatives in Jacksonville at intervals between 1870 and 1890, and that until his death he was in communication with his Florida relatives by correspondence and by personal visits made by some of them to him at his place of residence; furthermore, it is stated that the defendant Mary Hudnall, daughter of Milo, visited and resided with her Jacksonville relatives for a period of several months on one or more occasions, more than 30 years ago, and thereby obtained ample opportunity to learn of any interest she had, or any interest that she might have thought she had, in the Hudnall grant, and of any part of it which was then and is now within the city of Jacksonville.

Prior to 1851 the Hudnall grant was devoted mainly to agricultural purposes. In 1840 it was assessed to David Brown as third-class farming land, and a tax of 95½ cents was imposed thereon. The developments on the land of the water front began in 1851. In that year the Finnegan mill was erected, and was operated continuously until 1907, when the property was leased by the Seaboard Air Line Railway, which erected thereon the Maxwell Docks at a cost of $135,000. In 1917 the complainant the Southeastern Investment Company purchased said property for $200,000, and leased the same to the complainant Seaboard Air Line Railway. In 1852 Kelly and Capron erected a sawmill farther east of this water front, and operated it until it was destroyed during the War between the States. It was rebuilt and operated until 1910, when said sawmill property land was sold for $300,000 to the complainant Deep Water Terminals. In 1855 the Mecklenberg mill was built

near Commodores Point, and was operated until burned during the War between the States. In 1866 the Victoria mills were built on this site, and operated until 1870, when destroyed by fire. This mill was one of the largest in East Florida, and about 4,000 feet of water front was utilized for its purposes, including wharves and log boom that extended to Commodores Point.

Between 1870 and 1914 this property passed through various hands, till it became the property of complainant Commodores Point Terminal Company, which made improvements thereon, and the property adjacent thereto, of the value of approximately $1,000,000. Afterwards the United States government erected a shipbuilding plant on the property lying next north of the Commodores Point Terminal's property, and also subsequently the complainant city of Jacksonville purchased this property for public purposes, paying a large sum therefor. In 1852 Henry Timanus purchased from Brantley all of the western side of the Hudnall grant, except three certain tracts previously sold to Bellechasse and Finnegan, Kelly and Capron, and William Mooney. In 1852 Timanus moved into the residence previously erected by Brantley on this property and began the cultivation of it.

The bill gives a detailed history of the rapid development of this property from that time on to the present, showing the conversion of the lands not on the water front from a plantation into a thickly settled part of a city of more than 90,000 people. In 1866 Eppinger & Russell constructed a large sawmill just west of the Mecklenberg mill, which was operated until about 1880, when it was burned. All of the mills, including those erected in 1851, 1852, and 1855, utilized the water front for milling purposes. Each had log pens and wharves, at which ships were loaded with lumber for distant ports. It is asserted that the operation of these mills constituted the principal industry of the city and community, and that such use and occupation of the property was unusually open to observation. From 1838 to this time all taxes and assessments for improvements on the Hudnall grant and on the land itself were paid by David Brown and those claiming under him.

[30] The ancestors of the defendants had ample opportunity to learn of the execution of the deed to David Brown, of the conveyances made to Brantley and Bryant, and of the subsequent conveyances and improvements made on the lands. For more than three-quarters of a century they delayed taking any steps to assert any interest in the lands —failed to pay taxes and to do anything else regarding it. Having the means of knowledge, they are presumed to possess the knowledge of the facts. "There must be reasonable diligence; and the means of knowledge are the same thing in effect as knowledge itself." Wood v. Carpenter, 101 U. S. 135, 143 (25 L. Ed. 807). If the ancestors, under whom the defendants now claim, would be estopped, they, claiming under such ancestors, are bound by the estoppel. Armstrong v. Wilcox, 57 Fla. 30, 49 South. 41, 131 Am. St. Rep. 1080.

No precise definitive rule covering all cases can be laid down of an estoppel in pais; but a few leading illustrative cases where estoppel has been enforced will show what the law is. In the case of Wetzel v. Minn. R. T. Co., 169 U. S. 237, 18 Sup. Ct. 307, 42 L. Ed. 730, a land

warrant was issued to the widow and minor children of a deceased soldier. A sale of the warrant was made by the widow without an order of court, and was invalid as to the minor children. This defect was not discovered by the plaintiffs until 44 years afterwards, when they were advised of the defect by an attorney. The plaintiffs then brought suit in equity to have the land declared to be held in trust for their benefit. The widow and the heirs lived in Philadelphia. The land was located near St. Paul. In affirming the action of the District Court in dismissing the bill for laches, the court stated as follows:

"Knowledge of the transfer seems to have finally come to them, not through any exertion of their own to inform themselves of the facts, but by an accidental meeting with a lawyer from Minnesota, who had in some way, probably by an examination of the title, become cognizant of the defect in the transfer. It was a mere matter of chance when they would be informed of the defect in the defendants' title, or whether it would ever come to their knowledge at all. To permit them now, after a lapse of 44 years from the time the warrant was issued, and of 30 years from the time the youngest child became of age, to impeach the transaction, would be an act of the most flagrant injustice to the present holders of the property. This property, which was probably not worth more than $100 or $200 at the time of the location of the land warrant, is now estimated to be worth at least $1,000,000, and is covered or partly covered, by houses and business blocks. In the 44 years that have elapsed since the warrant was issued these lands have been platted and sold in lots to purchasers, who were probably ignorant in fact, if not in law, of any defect in the title, and relied upon the validity of the transfer from the widow and heirs of Remsen and upon the patent from the United States, which appears to have been regularly issued after an examination of all the facts attending the granting, transfer, and location of the land warrant by the officers of the Land Department. While the fact that the complainants were ignorant of the defect in title, and were without means to prosecute an investigation into the facts, may properly be considered by the court, it does not mitigate the hardship to the defendants of unsettling these titles. If the complainants may put forward these excuses for delay after 30 years, there is no reason why they may not allege the same as an excuse after a lapse of 60. *The truth is, there must be some limit of time within which these excuses shall be available, or titles might forever be insecure.* [Italics supplied.] The interests of public order and tranquility demand that parties shall acquaint themselves with their rights within a reasonable time, and although this time may be extended by their actual ignorance, or want of means, it is by no means illimitable."

In Wehrman v. Conklin, 155 U. S. 314, 15 Sup. Ct. 129, 39 L. Ed. 167, the complainants in 1881, 1882, and 1884 purchased the lands from a purchaser at a sheriff's sale on an execution issued on a judgment against defendant's grantor, on July 31, 1862, and went into possession, paid all taxes, and made improvements by putting 600 acres under cultivation, erection of substantial buildings, etc., at an expense of $1,000, in reliance upon their title being good and valid. The defendant claims through a deed from the judgment debtor, which was executed on the same day the suit which resulted in the execution sale was commenced, December 17, 1859. For 27 years the defendant took no steps to assert his title, but practically abandoned the lands until, by increase in population and settlement of the community, the lands became valuable. The defendant resided in another state, was an ordinary day laborer, and while there was no proof of his actual knowledge of the adverse occupation, "he was not a man to invest $3,000 in wild lands and turn

his back upon them for 27 years." The court held that, "in short, it would be difficult to conceive of a clearer case of estoppel in pais."

In Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738, the complainant, who based her title on mesne conveyances from Wing, who held the land under a patent issued by the United States on April 20, 1882, filed a bill on June 1, 1886, to quiet her title to a tract of land contiguous to the city of Tacoma. The defendant Galliher claimed the equitable title to the land as the widow of a homestead entrant on the land on August 10, 1872, who died on April 18, 1873, and whose entry was canceled for want of final proof on December 4, 1879. The defendant Galliher made application for the lands on November 20, 1880, under an act of Congress enacted June 15, 1880 (21 Stat. 237), which was denied on June 20, 1884. Thereupon she took no further action to establish her claim until she filed her answer in this cause. Since the lands had been patented to Wing, there had been a rapid growth in the population of the city of Tacoma, the census showing a population of 1,098 in 1880 and 36,006 in 1890, and there had been a corresponding increase in the value of the lands. There had been three or four conveyances of the land through as many different persons at a constantly increasing price; the lands had been platted, and $20,000 worth of improvements had been placed thereon. The defendant resided within 40 miles of Tacoma, and must have known of the changes going on in that city. The court held that, even though there was a delay of only 2 years in prosecuting her claim after it had been denied by the land office, these facts created an estoppel against the defendant, or constituted laches. In this case the court frequently makes use of the word "laches," but it is made plain the court considered that laches of the kind shown in that case amounted to an estoppel, as appears from the opinion. The court said that "counsel for appellant, arguing against an estoppel by reason of laches, say that the patentee and those claiming under him," etc. The words "estoppel by reason of laches" are the words of the court.

In Swift v. Smith, 79 Fed. 709, 25 C. C. A. 154, the plaintiff claimed title as the heir of her father, who died owning a certificate showing that he was entitled to a deed to the land in question in 1863. The administrator acquired a deed to the land as administrator in 1864, and sold the land under a void judicial order in 1867 for $1,000. The lands were located in Pueblo county, Colo., where the decedent resided and died. The defendant held the lands through eight mesne conveyances from the administrator, having paid $25,000 for the land in 1889. The lands had been occupied and improved since 1869. The plaintiff was born in 1853 in New Jersey, and lived there until 1867, when she moved to and thereafter resided in Nebraska, and claimed to have discovered the title of decedent to the lands in 1891. The evidence showed that plaintiff knew her father died in Pueblo county, Colo., and had heard that he owned lands there, and that she knew the administrator of the estate. It was also shown that her guardian had acknowledged receipt of payment for the land in question. Held, knowledge imputed to plaintiff, and that she was guilty of laches.

The case of Swift v. Smith, supra, has special application to the instant case on the subject of notice, as well as upon that of estoppel. In 1857 Milo Hudnall, Mary A. Prevatt, and Elizabeth Ann Henderson

joined with the other heirs of Ezekiel Hudnall in the conveyance of a tract of land situated in Putnam county, Fla., belonging to Ezekiel Hudnall's estate. Having at that time obtained knowledge that the estate owned lands situated in Florida, under the doctrine of Swift v. Smith, it became the duty of the heirs to make inquiry as to whether they had any claim to other lands, and these heirs and their descendants are chargeable with knowledge of all such facts as they would have learned through diligent inquiry.

In the case of Muse v. Arlington Hotel Co. (C. C.) 68 Fed. 637, 651, it was held that the claimant of a Spanish title originating in 1788 was estopped in 1894 to sue for the possession of the tract on which were located the Hot Springs of Arkansas, which the United States government had meanwhile set aside as a sanitarium and improved at great expense, and upon which tract a city had been built by people who relied upon the government ownership of the land and particularly of the springs.

In Coram v. Palmer, 63 Fla. 116, 58 South. 721, the facts were that James Niblack entered upon United States lands and made the final payment therefor before his death, which occurred in 1846, and in 1906 the patent therefor was issued to James Niblack. In 1849 the land came into the possession of Wm. B. Ross, who put improvements thereon. Ross was succeeded in possession by his son, who was succeeded by one Daugherty, whose administrators sold the land to Palmer, by whom the land was improved. Palmer was sued in ejectment by the heirs at law of Niblack, who claimed title to the land under the patent of 1906. The plea was not guilty. Palmer defended, by producing a deed from the administrators of James Niblack to Wm. B. Ross, by proof that Ross took possession of the land and improved it, and that he was succeeded in possession by his son, who was succeeded in possession by Arthur Daugherty, whose administrators sold the land to Palmer, who improved it. The circuit court charged the jury as follows:

"If you believe the plaintiffs, or those with whom they may be in privity and under whom they claim, stood by and saw other parties delivering title to the lands in question, cultivating and improving them for 20 years or more, where there was no impediment to bring suit and recover them, and during the time made no claim to the land, their claim becomes stale, and they cannot recover the land, although they may have legal title to it."

There was a verdict for the defendant. The Supreme Court approved the charge to the jury, held in substance that it was immaterial whether the deed from James Niblack's administrators was valid, and that the plaintiffs were estopped from asserting their legal title, by standing by while others were improving the land and from time to time delivering title to it.

In Moseley v. Taylor, 68 Fla. 295, 67 South. 95, it was held that where W. B. Taylor, the head of a family residing on land which was his homestead, died in 1886, and attempted to devise the land to his widow, who resided on the land for 3 years, and on July 18, 1908, conveyed the land to one of her sons, who on November 24, 1908, mortgaged it to a party who had no knowledge of the homestead character of the land, another son and one of the heirs at law of W. B. Taylor

could not in 1913 bring a bill to set aside the conveyance and mortgage on the ground that the will did not transfer the title to the homestead. The court said that the homestead character of the land was a matter resting in pais, and of which there was no record evidence, and that an heir at law, who intended to assert his rights in the homestead and in opposition to the will, must act with reasonable diligence, in order that innocent purchasers might not be deceived.

It is alleged in paragraph 50 of the bill that the records of Duval county never furnished any evidence as to who were the heirs at law of Ezekiel Hudnall, deceased, and that for a period of 80 years Eliza Bagley and Henry Hudnall and their descendants allowed their claim to heirship to Ezekiel Hudnall's estate to lie dormant, and did not in any way attempt to correct the general belief of the public and the prevailing confidence in the completeness of the title derived from Elizabeth Hendricks, and that the complainants purchased their lands without notice of the claims of the defendants, and are entitled to the protection of a court of equity as bona fide purchasers without notice. This averment brings this case directly within the principle of Moseley v. Taylor, supra. The defendants' heirship is a matter resting in pais, just as the homestead character of the land involved in Moseley v. Taylor was, and these defendants and their ancestors were under as imperative an obligation to diligently assert their alleged rights against the deed of Elizabeth Hendricks, "in order that innocent purchasers may not be deceived," as was the heir at law in Moseley v. Taylor.

In Norton v. Jones (Fla.) 90 South. 854, the main facts were that in 1825 one Polly Lewis acquired title from the United States to 640 acres of land situated on Bay Biscayne, near the mouth of the Miami river, Fla. In 1832 one Mary Lewis executed a warranty deed to one Richard Fitzpatrick, which purported to convey the entire tract of 640 acres in fee. In 1920, one Norton, trustee for certain heirs of Polly Lewis, filed a bill for the partition of said lands against other heirs of Polly Lewis and certain persons claiming possession under the said deed of Mary Lewis. The bill alleged that neither Polly Lewis nor her heirs had ever conveyed said lands; that the said Mary Lewis never had title to said lands and that her deed to Richard Fitzpatrick conveyed no estate therein; that a chain of deeds commencing with the deed to Richard Fitzpatrick had been executed and spread on the public records; and that various persons claiming under said deeds were in possession of said tract of land claiming title thereto. The bill alleged that the lands were wild, uncultivated, and unimproved. The bill prayed for partition of the lands, that the deeds of the persons claiming under Mary Lewis might be adjudged void and canceled as clouds on complainants' title, etc. The Supreme Court of Florida adjudged the bill bad on demurrer, because of laches and for other reason. The court took cognizance of the fact that the city of Miami was built on this land, and that there had been great activity in the transfer of real estate in that city for the past 20 years, and adjudged that a bill which did not present some good reason for the long delay was bad on demurrer, because of laches.

It is apparent that the laches here spoken of were laches operating

as an estoppel, spoken of by Justice Brown in Galliher v. Cadwell, 145 U. S. 368, 374, 12 Sup. Ct. 873, 36 L. Ed. 738. To demonstrate the comparative strength of the Norton Case, sometimes called Polly Lewis or Miami Case, supra, with the instant case, on the facts of each, I call attention to the allegations of this bill, which show that in 1890, East Jacksonville was itself a larger town than Miami was, and all the lands involved in this suit were then in the actual occupation of the complainants, and a part of them were still the sites of large sawmills.

My belief is that as a matter of law and right the defendants are estopped to claim title to these lands, and that even estoppel operated against their ancestors prior to 1851. The events which have occurred in the two decades of the current century are sufficient to establish an estoppel of themselves, without considering the 62 years of the nineteenth century. Several times since 1900, each of the properties involved in this suit has changed hands. Instancing again, one of the complainants, the Seaboard Air Line Railway, placed improvements since 1907 of the value of $135,000 on this property owned by it. Since 1914 the Commodores Point Terminal Company improved their property at a cost of over $600,000, and in 1918 the United States government expended hundreds of thousands of dollars upon the portion afterwards purchased by the city of Jacksonville for $315,000. During all the years the defendants stood by and suffered these complainants to invest large sums of money in the purchase of the respective properties owned by them, and sub silentio acquiesced in the expenditure by the complainants of vast sums in the improvement of the properties. In Galliher v. Cadwell, supra, it was held that a delay of *only two years* estopped the defendant from asserting her right to lands located near a growing city; it appearing that values were rapidly advancing and that frequent transfers of title occurred during the 2 years' delay.

The facts of the instant case are stronger than those in any cited. The title of David Brown was originated under circumstances which rendered it from the very beginning a colorable title. He did not enter by stealth or fraud; he came into possession of the lands openly, under a deed of general warranty from Elizabeth Hendricks. The facts and circumstances of his entry, possession, and ownership were notice to the heirs that he claimed the complete title and the exclusive right to these lands. Gracy v. Fielding, 71 Fla. 1, 70 South. 625. Back of this, the circumstances of the transaction were such as to indicate unmistakably that both Elizabeth Hendricks and David Brown believed that she had the right as a Spanish widow to convey the perfect title. At the time she made her deed to Brown her children were then grown, and it may be reasonably presumed that they knew of the sale and conveyance and approved of it. The bill shows that there were unliquidated debts of the conjugal partnership at the time of the sale and the execution of the deed, and that the property was sold to obtain funds to discharge such debts. There was, in legal contemplation, an immediate and definite advantage from the sale of the Hudnall grant and the application of the money to the payment of these debts; and this is true because, at the time of the death of Ezekiel Hudnall, he

had title to 900 acres of other lands situated in the county of Putnam, not in Duval, Fla. In 1857 the heirs at law, including the ancestors of these defendants, and Elizabeth Ann Henderson, under whom some of these defendants claim under a general devise, sold and conveyed such 900 acres for $625, and acknowledged the receipt of the purchase money. It was the sale of the Hudnall grant and the application of Brown's money to Hudnall's debt that freed the 900-acre tract from liability, and made it possible for the heirs to enjoy the proceeds of the 900-acre tract.

Moreover, David Brown entered under a deed of general warranty. That fact, coupled with open and notorious possession and the enjoyment of the land, operated as an ouster of the defendants' ancestors and initiated the estoppel as of May 10, 1838. In Jackson ex dem. Bradstreet v. Huntington, 5 Pet. 402, 8 L. Ed. 170, it is held in effect that, where one tenant in common conveys the whole and his grantee enters as the sole owner in fee, his entry is adverse, and will not be presumed to be as tenant in common. Of the same effect was the conclusion in Harpending v. Reformed, etc., Church, 16 Pet. 455, 10 L. Ed. 1029.

[31] It was held in Stoddard v. Chambers, 2 How. 284, 11 L. Ed. 269, also in Taenzer v. Chicago, etc., R. Co., 170 Fed. 240, 247, 95 C. C. A. 436, and in George v. Tate, 102 U. S. 564, 26 L. Ed. 232, that a right founded on equitable estoppel constitutes a title on which a suit at law or in equity may be maintained, and that, where equity can give more adequate relief, the estoppel may be enforced in equity; which in such cases will exercise its ancient jurisdiction over estoppel. The soundness of the ruling is supported by the reason that the doctrine of estoppel is equitable.

Upon the facts, the complainants are entitled to relief, because the defendants and their ancestors have acquiesced in and have ratified, at least constructively, the title asserted by complainants under the deed from Elizabeth Hendricks to David Brown, and the defendants are estopped from asserting against the complainants any title as heirs of Ezekiel Hudnall to the lands described in the first seven paragraphs of the bill, for it is familiar that estoppel does not operate in a negative way only, but that it does in proper case work affirmatively as well, and creates a right in favor of the injured party to the property involved. 2 Pom. Eq. Juris. § 804; 3 Story's Eq. Juris. § 1989; Kirk v. Hamilton, 102 U. S. 68, 26 L. Ed. 79; Erwin v. Lowry, 7 How. 172, 12 L. Ed. 655; Muse v. Arlington Hotel Co. (C. C.) 68 Fed. 637, 651.

Coming, now, to the last question in the case, the court will, under the facts, presume the execution of a deed by Henry Hudnall and Eliza Bagley (née Hudnall), or by their descendants, which conveyed the interest of these parties to the complainants' predecessor in title. I need not repeat all the facts recited; and it is not necessary even to reiterate that since May 10, 1838, neither the ancestors of nor the defendants themselves ever by any act whatever manifested any interest in this property until 1916, and that during all the years they had nothing to do with or about the land. The presumption is warranted

283 F.—13

that any interest that heirs at law of Ezekiel Hudnall ever had in this property has been extinguished by deed of conveyance or otherwise.

[32] Justice Story—and he and Chancellor Kent were the great pioneers of American equity jurisprudence—declared just 100 years ago that it is an ancient and settled doctrine that the presumption of a grant of lands will be adopted because of the infirmity of human nature, the difficulty of preserving muniments of title, and the public policy of supporting long and uninterrupted possessions. The presumption is founded upon consideration of such facts that could not have occurred according to the ordinary course of human affairs, unless there was a transmutation of title to, or an admission of an existing adverse title in, the party in possession. Ricard v. Williams, 7 Wheat. 59, 109, 5 L. Ed. 398. There are no rebutting facts to exempt this case from the operation of such wholesome rule.

In the case of Fletcher v. Fuller, 120 U. S. 534, 7 Sup. Ct. 667, 30 L. Ed. 759, in essential particulars like the one here, there was involved the right to presume a deed. The trial court was requested to instruct the jury:

"That the presumption they were authorized to make of a lost deed was not necessarily restricted to what may fairly be supposed to have occurred, but rather to what may have occurred and seems requisite to quiet title in the possessor."

The court refused this charge, but did charge the jury in effect that, in order to presume a lost deed, the jury must be satisfied that such a deed had in fact actually existed, and the Supreme Court said in the opinion that "such seems to us to be the purport of the charge, and therein there was error." The opinion in this case is too long to quote, but is pertinent in the consideration of the present case. The case was, after reversal, retried in the Circuit Court, and the verdict was in favor of the defendant, who stood in a position similar to the complainants here. It is reported in 44 Fed. 34, and the action in which the adjudication was had was commenced in 1880, 112 years after the initiation of the adverse title. The complainant's ancestors sued in 1835, but had dismissed the suit in 1838, and also at various times between 1826 and 1857 the plaintiff's ancestors had asserted title to the land by cutting and removing wood therefrom, so it appears that the claimants there under Abigail Fuller were more diligent than the Hudnall heirs in asserting their claim.

It is not without just foundation to say that the consideration of a wise public policy, in this case affecting thousands of people, with their homes and their churches and other properties on the lands here involved, calls more for the presumption of a deed than in the case of Fuller v. Fletcher, which concerned an unimproved tract of land of comparatively small value. In that case the jury was instructed to presume a deed from Abigail Fuller, the ancestor of the complainants, and therefore it does not seem to go far afield to presume a deed from Henry Hudnall and Eliza Bagley (née Hudnall) and her husband to Elizabeth Hendricks, who in her turn executed the deed to David Brown.

[33] In U. S. v. Chaves, 159 U. S. 452, 464, 16 Sup. Ct. 57, 62 (40 L. Ed. 215), the Supreme Court said:

"That by the weight of authority, as well as the preponderance of opinion, it is the general rule of American law that a grant will be presumed upon proof of an adverse, exclusive, and uninterrupted possession for 20 years, and that such rule will be applied as a præsumptio juris et de jure, wherever, by possibility, a right may be acquired in any manner known to the law."

Again, in U. S. v. Chavez, 175 U. S. 509, 523, 20 Sup. Ct. 159, 164 (44 L. Ed. 255) that court declared that:

"Quoting the language of the Supreme Court of Tennessee, approved by this court, it assumes that 'all that might lawfully have been done to perfect the legal title was in fact done and in the form prescribed by law.' And 'there is hardly a species of act or document, public or private, that will not be presumed in support of possession. Even acts of Parliament may be thus presumed, as also will grants from the crown.'"

In Norton v. Jones, supra, the Supreme Court of Florida adopted the doctrine of Fletcher v. Fuller, supra, and applied it to a case where the facts were quite similar. The court said that:

"In view of the disclosed dealings by adverse parties with the title to the lands and with the lands themselves, beginning in 1832 with a conveyance of the lands by a party asserted to be adverse to the alleged cotenants, and of the failure of the cotenants to assert their claim till 1920, it may be presumed that the title of the ancestor of the alleged cotenants was extinguished by conveyance or otherwise, since only upon such an assumption can the dealings with the title and with the lands by those claiming adversely to the alleged cotenants and the many years of apparent silence and acquiescence of the alleged cotenants and their predecessors, and of their failure to assert their claim or to excuse the failure to do so, be reconciled with the ordinary course of human conduct with reference to interests in lands."

There is a marked resemblance between the facts of Norton v. Jones, supra, and the case at bar. In that case the title in aid of which the court said a deed would be presumed originated in 1832, under a deed which was alleged to have been executed by a party who had no title, and it was not until 1920 that the alleged owners of the paper title made their claim to the lands concerned, upon which a part of the city of Miami had meanwhile been built. It is a matter of history, however, that prior to 1890 the property there involved was unimproved land, except perhaps a few small tracts. This case is stronger than the Miami Case, for here the occupation began in 1838, and shortly afterwards, in 1850, suburban occupation commenced.

[34] The application of the doctrine, enunciated in the foregoing cases, to the instant case, leads to the conclusion that upon the facts stated in the bill there was a conveyance of the interests of Henry Hudnall and Eliza Bagley to one of the claimants' predecessor in title; such should be presumed, if such a conveyance was legally possible. There need be no evidence that such conveyance was in fact made, nor is the court compelled to believe that such a conveyance was probably made; for it is sufficient that the execution of such a conveyance was legally possible, and that the presumption of its execution would solve the difficulties of this case and quiet this title, now beclouded and disturbed by the assertion, and the further threatened assertion, of a very ancient and stale claim.

There is no doubt that the execution of such a deed was possible; Hudnall and Bagley were fully competent to make it, and so were their children who came after them. It will be presumed that the interests of the minors were duly conveyed by virtue of an order of the probate court or otherwise. There is hardly a species of act or document, public or private, that will not be presumed in support of the possession, such as is now being enjoyed by the complainants here and the 1,000 or more others in like situation. U. S. v. Chavez, supra. The Supreme Court of Tennessee, in Williams v. Donell, 2 Head, 695; held that:

"If a person who enters land, and those claiming under him, have the exclusive * * * possession of said land, claiming the same to the extent of the boundaries of the entry, for a period of 20 years, a grant, commensurate with the boundaries of said entry, will be presumed."

This principle is approved in the Fletcher and in the Chavez Cases, supra. As a matter of course, a presumption of a conveyance is rebuttable, but here there does not appear to be any evidence inconsistent with this presumption. The conduct of all the parties from 1838 to 1916 is consistent with the presumption of a grant.

In Reed v. Money, 115 Ark. 6, 170 S. W. 480, it is held, upon the authority of Fletcher v. Fuller, supra, that where appellee, and those under whom he claims, have been in the open, peaceable, continuous, and adverse possession of certain land for a period of about 57 years, it will be conclusively presumed that the original holder in appellee's chain of title acquired a deed to the land from those who had authority to make it; it not appearing that the latter persons made any other disposition of the land.

I am compelled to say that the claims of the defendants do not appeal to a court of equity, and that, in view of all the facts chronologically stated in the bill, the complainants are entitled to such favorable judgment of the court as it is now within its power to give.

By a formal decree, the motions made by the defendants, where separately made and where joint, will be severally overruled and denied.